Hillsborough, }
Dec. 1, 1936. }

JAMES A. FERRETTI & *a. v.* WILLIAM A. JACKSON & *a.*

*Wyman, Starr, Booth, Wadleigh & Langdell (Mr. Booth* orally), for the plaintiffs.

*Thomas P. Cheney,* Attorney-General, and *Dudley Orr,* Assistant Attorney-General (*Mr. Orr* orally), for the defendants.

ALLEN, C. J. The act to regulate and control the distribution and sale of milk (Laws 1935, c. 21), so far as it here requires discussion, may be summarized as follows:

Section 1 provides: "It is hereby declared that a public emergency exists growing out of the abnormal disruption of economic and agricultural conditions. The general purpose of this act is to protect and promote the public welfare and to eliminate unfair and demoralizing trade practices relative to the distribution and sale of milk."

By section 3, the office of a milk control board of three members, to be appointed by the governor and council, is created.

By section 6, "The board shall have power to supervise, regulate and control the distribution and sale of milk for consumption and / or use within the state . . . . The board may adopt, promulgate and enforce all rules and regulations necessary to carry out the provisions of this act . . . . Provided that nothing in this section shall be construed to affect existing laws relating to milk inspection, the testing of milk and milk products or to the powers of the state board of health relative to public health, or local health ordinances and regulations." By section 8, the board may not exercise its power in any market, defined in section 2 as one or more geographical units designated by the board as a natural marketing area, except upon application of at least fifty consumers, or of a producers' or distributors' co-operative association supplying a substantial proportion of the milk consumed in such market, or of producers or distributors or both supplying such proportion if there is no such association.

By section 9, "The board, after receiving such application, may, after due public notice hold a hearing and investigation, define the market, fix just and reasonable minimum wholesale and retail prices to be charged for milk in such market, may fix different minimum prices for different grades of milk and may fix just and reasonable minimum prices to be paid producers by distributors." The section also forbids sales below those fixed by the board either directly or by indirect methods, and another section (13) prescribes penalties of drastic extremes for violation of the act or of any rule or regulation of the board.

Respecting the claimed conflict of the act with the state constitution, one point urged is that the act is a void attempt to delegate legislative power. The general principle that except in respect to local government such power is vested only in the legislature by force of the constitution (Const., Pt. II, art. 2) has been heretofore elaborated (*Gould* v. *Raymond*, 59 N. H. 260, 276; *State* v. *Hayes*, 61

N. H. 264) and needs no discussion. And the principle that a law-enforcing agency may be empowered to adopt rules and regulations requisite to a proper execution of the law to be enforced is also well settled. *State* v. *Normand*, 76 N. H. 541. But in application it is often difficult to draw the line between general legislation which is non-delegable and that which has such executive attributes that the legislature may constitutionally give authority to the enforcing agency to ordain it.

Rules and regulations validly made by such an agency are in actuality laws. They correspond to municipal ordinances. They are directions and orders of conduct, at least when other than of course or procedure, and meet all tests and definitions of law. The duty and obligation of compliance is created and imposed by the authority and force of public government. If subsidiary to a broader or more general law and an aid to enforcement, that may be the condition upon which their validity depends, but it does not affect their standing as laws in true comprehension. They may be conveniently classified for their special features, and distinguishing words may be used to designate their special character. Their identity as laws nevertheless remains.

It is said in *State* v. *Normand*, 76 N. H. 541, 545, that authority to an enforcing board to make necessary rules and regulations to secure efficient enforcement of its prescribed functions "was not intended to authorize the board to legislate, or to add to, change, or modify the statute," and "was not intended as a delegation of legislative power." The reasoning clothes the rules and regulations with a prevalence of administrative characteristics when the real prevalence is legislative. The occasion for action is confused with the action taken. If the legislature had specifically enacted them, they would have been laws as much as the provision of the enactment which was an exercise of the power to delegate their making. They were no less laws when enacted by the duly delegated authority. The delegation being permissible, the enactment for it is proper.

In *Grafton &c. Co.* v. *State*, 77 N. H. 490, 507, the court advanced the theory by way of *dictum* of a distinction between "legislative power which can be delegated" and "the general power of making law entrusted to the legislature, which is absolutely non-delegable." In other words, as is said in the opinion, "It may delegate powers not strictly legislative which it may rightfully exercise." This view assumes some executive power in the legislature. It is consistently reciprocal with the conception in *State* v. *Normand*, *supra*, that the

rules and regulations which an enforcement agency may establish are non-legislative in character.

To accept the proposition that there is some special feature in developing a program of a declared policy of regulation distinct from legislation seems to unduly emphasize the executive side of regulation and to render insignificant its precedent legislative attribute. While in facility of language we say that the legislature has the power of regulation as a form of the police power, strictly it has only the power to provide for regulation, the actual control under regulation being administrative. The orders for and of regulation are laws. If a part of regulation, then regulation is a twofold and separable affair, partly legislative and partly administrative. Although often grouped in one assembled unit, the parts are not interchangeable, but only mixed together.

The real situation is that the constitution contemplates no absolute fixation and rigidity of powers between the three great departments of government in its order that they shall be "kept as separate from, and independent of, each other, as the nature of a free government will admit, or as is consistent with that chain of connection that binds the whole fabric of the constitution in one indissoluble bond of union and amity." Const., Pt. I, *art.* 37. This provision of interrelation, as a practical need of the proper functioning of government, has been recognized with no narrow interpretation by the courts. Areas of concurrent authority have been held properly constituted when exact boundary lines, not prescribed, give rise to undue interference with the reasonable exercise of valid governmental activities. *Attorney-General* v. *Meader*, 80 N. H. 292, 293; *Opinion of the Justices*, 85 N. H. 562, 566-568. While " . . . recognition of the separation of the three departments as a vital and underlying principle in our form and structure of government has been uniformly and consistently given, and the force of the principle remains to-day unimpaired" (*Opinion of the Justices, supra,* 569), and while "A slight exercise of unconstitutional power by either department of the government is not less invalid than an extensive exercise of it" (*Ashuelot Railroad* v. *Elliot*, 58 N. H. 451, 457), the constitution permits the legislature to empower the executive department to enact legislation of a subordinate nature to a general law to meet the necessities of government. "The supreme legislative power" (Const., Pt. II, *art.* 2) is vested in the legislature, but not the sole and exclusive power in respect to incidental and subsidiary legislation. The authority to delegate the power of local legislation to municipalities of

the state has been long and positively affirmed, and some power to aid the executive department in performing the duties and functions assigned to it by authorizing it to legislate for the furtherance of such performance no less resides in the legislature. "The vote of a body of substitutes, assembled in the state-house or elsewhere, is not legislation, unless authorized by a legal construction of the constitution" (*Gould* v. *Raymond*, 59 N. H. 260, 276), but what the constitution permits according to such construction is valid.

This allowance of interrelation is the general as well as the local theory. "The separation of the powers of the state into executive, legislative and judicial departments is not so absolute as to make them wholly independent. They are co-ordinate, working together and carrying into effect conjointly the whole power of the state. Though touching one another at all points and united as are all parts of the human body, each performing its peculiar function, all three must be in constant operation, and to some extent connected and interdependent." *Morris* v. *Taylor*, 70 W. Va. 618. "The provision for keeping the departments of government separate does not mean an absolute separation of functions, for if it did it would really mean that we are to have no government, whereas our Constitution was ordained for the establishment of efficient government." *Sabre* v. *Railroad*, 86 Vt. 347.

The extent to which delegation of the power to legislate may be bestowed upon an enforcement agency has been given repeated consideration by the federal Supreme Court, and recently in the cases of *Hampton* v. *United States*, 276 U. S. 394, in which the "flexible tariff provision" of an act of Congress was upheld, of *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, in which authority to the President to bar from interstate commerce supplies of oil in excess of state permission of production and storage was held void, and of *Schechter* v. *United States*, 295 U. S. 495, in which the National Industrial Recovery Act was invalidated. While these cases interpret the federal constitution, that document ordains the same division and separation of the main governmental powers as does our local constitution, and the cases are therefore of applicable authority.

In the *Hampton* case the law was thus defined: "The field of Congress involves all and many varieties of legislative action, and Congress has found it frequently necessary to use officers of the Executive Branch within defined limits, to secure the exact effect intended by its acts of legislation, by vesting discretion in such officers to make public regulations interpreting a statute and directing the details of

its execution, even to the extent of providing for penalizing a breach of such regulations." The act in issue empowered the President to vary tariffs on imports to meet "changing conditions of production at home and abroad," and the delegation of legislative functions was held within valid limits.

In the *Panama Refining Co.* case exhaustive discussion of the question resulted in the announcement of the rule that in addition to a grant of authority "to selected instrumentalities for the purpose of ascertaining the existence of facts to which legislation is directed" Congress "may establish primary standards, devolving upon others the duty to carry out the declared legislative policy, that is, as *Chief Justice* Marshall expressed it, 'to fill up the details' under the general provisions made by the legislature." The considered act (the National Industrial Recovery Act) declared its policy, among other objectives, to promote the free flow of interstate and foreign commerce, to eliminate unfair competitive practices, to promote productive capacity of industries, to avoid undue restriction of production subject to temporary requirements, and to conserve natural resources. Specifically it authorized the President to prohibit the transportation in interstate or foreign commerce of petroleum or petroleum products in excess of a state's permission of production or withdrawal from storage. It was held that Congress had declared no policy for the transportation of excess oil, had laid down no rule, and had made no requirement or definition of circumstances and conditions for the allowance or prohibition of transportation.

Similarly in the *Schechter* case, the court said in respect to the "codes of fair competition" provided by section 3 of the National Industrial Recovery Act: "It supplies no standards for any trade, industry or activity. It does not undertake to prescribe rules of conduct to be applied to particular states of fact determined by appropriate administrative procedure. Instead of prescribing rules of conduct, it authorizes the making of codes to prescribe them. For that legislative undertaking § 3 sets up no standards, aside from the statement of the general aims of rehabilitation, correction and expansion described in Section one. In view of the scope of that broad declaration, the discretion of the President in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country, is virtually unfettered. We think that the code-making authority thus conferred is an unconstitutional delegation of legislative power."

These cases illustrate the distinction between the valid delegation

of subsidiary legislative power and the invalid transfer of primary legislative power. The principle laid down that a law is invalid when its commands are in such broad terms as to leave the enforcement agency with unguided and unrestricted discretion in the assigned field of its activity, is sustained by prevailing if not unanimous authority. It is in the application of the principle to concrete cases that disagreement is found.

The act here in issue is regarded as defective in its insufficiency of a declared policy and of a prescribed standard by which the authority delegated may be measured and effect given to the prohibition against the making of general laws by administrative boards or agencies.

The act shows no purpose of being a health measure. The stated purpose to protect and promote the general welfare is practically without significance. All legislation presupposes such a purpose. The remaining declaration of its aim to do away with "unfair and demoralizing practices relative to the distribution and sale of milk" indicates no concern for public health. And the evidence of the exclusion of such concern is convincing. The declaration of the existence of a public emergency growing out of "the abnormal disruption of economic and agricultural conditions" and the provisions for designating the termination of the emergency manifest the design of the act to meet temporary disturbances in the milk industry not affecting the public health. The act expressly provides that the board's exercise of regulation and control shall not "affect existing laws relating to milk inspection, the testing of milk and milk products, or to the powers of the state board of health relative to public health, or local health ordinances and regulations." The denial of the milk control board's right to entertain considerations of public health could hardly be expressed with greater positiveness and explicitness.

What practices are thought to be "unfair" and what "demoralizing," the act does not specify. It is construed not to refer to illegal practices. No reason is perceived for concluding that regulatory control of the industry, including minimum price fixing is needed for their suppression. The probable reference is to legal conduct, in one or more ways, having disruptive effect in the milk industry. In the absence of recital of the criticized conduct, presumably competition to the extent that the business of the industry was being conducted at less than a fair profit, was in mind. Other conduct also may well have been. Methods of operation affecting costs of pro-

duction and distribution, advertising, credits, and disposal of surplus supplies may be cited as possible items.

It follows that the legislature, failing to point out the practices considered unfair and harmful, has by necessary implication left it to the board to determine them. Otherwise it would not be enabled to say what the regulation and control should be and what if any minimum prices fixed. Whatever the board might deem to be unfair it might pronounce to be illegal. The act directs compliance with the board's orders, and its correction of practices found by it to be unfair requires their abandonment, with the act penalizing disobedience. For occasion found by it, the board might fix minimum prices. In brief, it was vested with power to do what it thought expedient in the suppression of methods of business it might consider harmful. The need and occasion for action as well as the action were all placed in the board's discretion.

In another aspect of the act, a policy to stabilize the industry and to promote its prosperity is fairly implicit. The eradication of harmful practices is intended not only for service in the removal of trouble but also as a restorative to welfare. Not only may existing methods of doing business be forbidden, but new ones may be ordered in their place, by the exercise of the regulatory function. A code of fair competition may be ordered, and the code, although a body of law, is for the board's decision both as to its making and as to its terms.

In substance the legislature has said to the board: Due to the emergency and to unfair trade practices by those or some of those engaged in the business, the industry of distributing and selling milk is in a deplorable state. To correct the troubles and to restore its prosperity, we empower you to regulate and control it, with incidental power to fix minimum prices. You may act only upon certain applications, but when they are made there is no restriction upon your extent and scope of action.

As has been said, the exact extent of legislative authority delegable to an enforcement agency may not be readily determinable in application. The sufficiency of the legislature's declaration of a policy and establishment of a standard depends in some measure upon considerations of degree, requiring the individual case to receive individual treatment. No precise or dogmatic tests may properly be employed. Allowance for coördination and coöperation is not to be unreasonably sparing. But the milk control act grants such a sweeping and general delegation of power that it clearly exceeds constitutional limits.

If an industry may be validly selected for regulatory control, in a policy to improve its condition, it may not be done in so skeletonized a manner as has been here pursued. The extent and limits of control must be determined by the legislature. Unrestricted control is unstandardized. The delegated authority may not be a substitute for the legislature in formulating the standard or any part of it. Determination of the need of particular action and of the character and form of action may be delegated, if the policy and standard for action have been announced with adequate completeness; although the grant of discretionary exercise of authority is less definitive of policy than the requirement of its exercise, it may yet suffice. But a general standard to uproot harmful conduct and to advance welfare, without further declaration in specification or in prescription of action, is too broad. Delegation of power to enact laws implemental to enforcement of a general law does not constitutionally include delegation of power to pass in full freedom of discretion upon both the expediency and the manner of the invocation of regulatory control.

In *Interstate Commerce Commission* v. *Company*, 224 U. S. 194, 214, the distinction was stated in this language: "The Congress may not delegate its purely legislative power to a commission, but, having laid down the general rules of action under which a commission shall proceed, it may require of that commission the application of such rules to particular situations and the investigation of facts, with a view to making orders in a particular matter within the rules laid down by the Congress."

Here the rules of action for the board are so general that it is left to the board to complete the generality and formulate its own supplementary policy how far to act as well as what to do in its exercise of control.

The legislature has undertaken to do more than create an administrative board with only authority to make rules tending to produce efficient and effective means of enforcement. The act is more a grant of authority to deal with the subject-matter in a discretionary manner than a direction to act with the right to issue orders in the performance of the directed action. The field of action is but little more limited than that of the legislature. Short of the implied denial of right to fix maximum as well as minimum prices, the board when permitted to act is as unrestricted in what it may do as is the legislature. It is clothed with legislative power beyond the mere delegation of power to do what is needed to efficiently administer its office. The power of regulation has been assigned to it with no

defined standard set for the manner or extent of its exercise. Some law-making power of a general nature is made a part of its functions. If all laws vesting specific powers in the Public Service Commission were repealed and a single law enacted vesting in it full and unrestricted control over railroads and utilities with no listing or enumeration of the methods of control or of the matters to be subjected to control, it would make a situation practically parallel with that here presented. As it is, the general law in regulation of railroads and utilities is in marked contrast with it. Another will is substituted for that of the legislature when its general power is turned over to others for its exercise. It is a delegation of uncontrolled discretion. It is "unconfined and vagrant," and "delegation running riot." "No such plenitude of power is susceptible of transfer." *Schechter* v. *United States*, 295 U. S. 495, 551, 553.

Attention has been called to acts upon the subject of milk control which have been sustained in other jurisdictions. So far as the cases upholding their validity have been examined, a full determination of the policy and standard by the legislature has been found, or the question of delegation has been unconsidered or, as it is thought, inadequately considered. In the *Nebbia* cases (*People* v. *Nebbia*, 262 N. Y. 259; *Nebbia* v. *New York*, 291 U. S. 502) the statute, with an extended declaration of policy, required the control board to fix both minimum and maximum prices, and the cases do not discuss the issue of delegation.

The local act (*s.* 17) provides that if some part of it or its application in some respect is held invalid, the remainder and other applications shall not be thereby affected. The provision is not available. The void attempt of the legislature to delegate its law-making power invalidates the whole structure and scheme of the act, and no part of it may be saved for any operative effect.

The validity of the act is attacked upon other grounds. In particular, the power of the legislature to provide for regulatory control over industries and businesses in general to the extent of fixing prices for products and sales is challenged. Decision in respect to it is not required, in view of the conclusion of an unpermitted delegation of legislative power, and is thought inexpedient. Any view taken would be based upon principles of adjustment between the exercise of the police power and the guaranteed rights of the individual which the sovereignty of the people has denied the government of the state the power to impair or destroy. Economic conditions bear upon the problem, and a change in them might alter a conclusion based

306

upon existing conditions, thus tending to defeat any value of a present decision as a precedent. Such a decision would so far partake of the nature of *dictum* as to subject it in some reasonable degree to a charge of having no more than preceptive force.

*Judgment for the plaintiffs.*

PAGE, J., was absent: the others concurred.