## ROWELL et al. v. STATE BOARD OF AGRICULTURE et al.

No. 6154.   Decided Feb. 7, 1940.   (99 P. 2d 1.)

*George W. Latimer*, of Salt Lake City, for plaintiffs.

*Fabian, Clendenin, Moffat & Mabey*, of Salt Lake City, for defendants.

LARSON, Justice.

This cause is before us on an application for a Writ of Prohibition. On April 13, 1939, The State Board of Agriculture under the provisions of Chapter 7, Laws of Utah, 1937, issued an order establishing the "Salt Lake Milk Marketing Area." It also issued an "Order on Fair Trade Practices within the Area." Under the terms of this order all distributors of market milk within the Area were required to procure a license from the Board of Agriculture, to comply with certain other rules and regulations, and to pay each month to the Administrative Agency the differential between the price of milk to the consumer as fixed by the Board and the price to be paid the producer as fixed by the Board. Plaintiffs, having refused to make the payments, were cited by the Agency to show cause why their license as a distributor of market milk should not be revoked, and seek prohibition from this court assailing the legality of the orders of the Board and the constitutionality of the Milk Control Act. For convenience, the Defendant David F. Smith will hereafter be referred to as the "Commissioner"; De-

fendants Hansen, Jensen, Richards, Johnson, Egans, Danzie and Bues constitute the State Board of Agriculture and will be referred to as the "Board"; the other defendants, constituting the Administrative Agency of the Salt Lake Milk Marketing Area, will be referred to as the "Agency."

By Chapter 7, Laws of Utah 1937, the legislature declared "the production, processing, and distribution of fluid milk for consumption in its natural * * * state" to be vested with a public interest, that "the general welfare requires a continuous and adequate supply of pure wholesome milk," section 2, and in the interest of assuring such supply it is recognized that the market must be stabilized and a fair price for market milk maintained. The Act vested the State Board of Agriculture with certain broad powers with relation to the distribution and sale of market milk. Section 4 of the Act. By Section 3, market milk is defined as "fluid milk and cream sold for consumption as such and shall not include milk used for manufacturing purposes." The statute authorizes the Board, upon certain conditions, (a) to establish market areas, with provision for selection of an administrative agency by producers and distributors; (b) to provide for fair trade practices within a market area; (c) to provide for control of surplus milk; (d) to provide, fix, and regulate a minimum price for market milk; (e) to license producers and distributors within a market area; (f) to collect fees from producers and distributors for the expenses of the agency.

The Board issued orders establishing the Salt Lake Milk Marketing Area with an administrative agency to govern the same; fixed a uniform price of market milk to be paid to producers by distributors, a price to be paid by stores to distributors, and a price to be charged all consumers. It provided that all milk coming into the Area, while bought by distributors from producers, and sold by the distributors to consumers, shall be considered as bought by the Agency from producers and sold by the Agency to the distributors. The distributors were required to charge the consumer at

the rate of 58½c per pound butterfat; to pay their producers only 44c per pound butterfat; take 4c per pound for handling, and pay the Agency 10c per pound, of which ¾ of 1% were to be used for advertising and administrative expenses, and the balance to be paid to other distributors, and their producers, whose milk was sold not as market milk but for manufacturing purposes and therefore at a price lower than that fixed for market milk.

Prior to the establishment of the district, plaintiffs had entered into contracts with their producers, whereby they agreed to pay the producers, 48c per pound butterfat. The Board ordered those contracts abrogated, cancelled and disregarded, and forbade payment to the producers of more than 44c although the cost of milk to the distributor was raised to 54c. Plaintiffs refused to remit to the Board the 10c per pound butterfat on milk handled by them. The Board sought to revoke their license and prohibit them from doing business. This action followed.

Plaintiffs assail the right of the Agency to cite them before it or to cancel their license upon both statutory and constitutional grounds. They contend:

(First) That the Act and particularly the provisions with reference to control of surplus milk and price fixing are unconstitutional for the reason that they violate Article I, Section 7 of the Constitution of the State of Utah and the 14th Amendment to the Constitution of the United States, U. S. C. A., by depriving the plaintiffs of their property without due process of law, and that it makes an unlawful delegation of legislative and judicial powers to the State Department of Agriculture and the Administrative Agency for the Salt Lake Milk Marketing Area.

(Second) That the Act and the particular provisions respecting fixing of prices and control of surplus milk by the milk pooling arrangement are unconstitutional in that they are in violation of Section 10, Article I of the Constitution of the United States of America which provides that no State shall pass a law impairing the obligations of contracts.

(Third) That the Area was not lawfully established because the petition was not signed by the requisite number of qualified signers.

(Fourth) That the Rules and Regulations issued by the Board are null and void because the petition therefor was filed and hearing thereon had before the Area was created and established.

We shall consider them in order as far as necessary to a determination of this cause.

Are the provisions with respect to fixing prices of milk void as a delegation of legislative powers? Or in other words, has the legislature fixed the prices of milk, or declared a necessity for fixing of milk prices and provided the proper measure, standards, and guides for determination and fixing of prices? The procedure set up by the Board seems to have been copied from that provided by the New York statute, Chapter 383, Laws of 1937 (New York), but our statute apparently was modeled with modifications after that of Virginia, Acts Va. 1934, c. 357.

Our statute vests in the Board the power to fix and regulate a minimum market price for market milk, and such price shall include the price paid to producers, price paid by stores or others who buy from distributors for resale, and the price paid by consumers, both wholesale and retail. Section 4, Chapter 7, Laws of Utah 1937. No procedure for price fixing is provided by the statute except that there must be a petition filed by a *producer, a distributor, or a consumer*, or any combination of them, asking that prices be fixed, and the payment of fifty dollars as a filing fee. As far as the statute is concerned the petition need contain nothing except a written request that a minimum price of milk be fixed by the Board. Two weeks notice is given by publication in a newspaper and a hearing is had. Section 6. Violation of any order promulgated by the Board is made a misdemeanor. There is nothing provided in the Act as to what conditions must be found to justify price fixing. Nothing is said as to what constitutes a fair price. No limits are set as to how

high or how low the price may be and nothing is said as to what objectives, purposes, standards, measures, or gauges shall guide the Board in determining either whether prices should be fixed or the amount of the price that is fixed. There is nothing requiring any proportion or relationship between the price fixed to producers and to consumers. We have noted these various missing parts to show the utter barrenness of the statute. The legislature made no finding or declaration of any relationship between price and continuous supply. The legislature made no finding that the regulation of prices offers any solution to any undesirable conditions which might be in the industry, or that any conditions existing in the industry are to be remedied by price fixing, and no declaration or statement of policy that regulation by price fixing is in the public interest.

That the legislature may not surrender or delegate its legislative power is elemental.

It may however, provide for the execution through administrative agencies of its legislative policy, and may confer upon such administrative officers certain powers and the duty of determining the question of the existence of certain facts upon which the effect or execution of its legislative policy may be dependent. *McGrew* v. *Industrial Commission,* 96 Utah 203, 85 P. 2d 608; *Morgan* v. *United States,* 304 U. S. 1, 58 S. Ct. 773, 999, 82 L. Ed. 1129. Said the New York Court in *Elite Dairy Products* v. *Ten Eyck,* 271 N. Y. 488, 3 N. E. 2d 606, 609:

"The Legislature may properly authorize an administrative officer to * * * determine questions of fact. Any discretion there left to the administrative officer is confined to a designated field, and within that field rests, not upon unfettered choice, but upon the application of rules of reason to facts proven or found."

In *Thompson* v. *Smith,* 155 Va. 367, 154 S. E. 579, 584, 71 A. L. R. 604, the court said:

"It is a fundamental principle of our system of government that the rights of men are to be determined by the law itself, and not by the let or leave of administrative officers or bureaus. This principle ought

not to be surrendered for convenience or in effect nullified for the sake of expediency. It is the prerogative and function of the legislative branch of the government, whether state or municipal, to determine and declare what the law shall be, and the legislative branch of the government may not divest itself of this function or delegate it to executive or administrative officers."

The court further said:

"The majority of the cases lay down the rule that statutes or ordinances vesting discretion in administrative officers and bureaus must lay down rules and tests to guide and control them in the exercise of the discretion granted in order to be valid  *  *  *."

And in *Mutual Film Corp.* v. *Industrial Commission of Ohio,* 236 U. S. 230, 239, 35 S. Ct. 387, 392, 59 L. Ed. 552, Ann. Cas. 1916C, 296, it is said:

"The legislature must declare the policy of the law and fix the legal principles which are to control in given cases; but an administrative body may be invested with the power to ascertain the facts and conditions to which the policy and principles apply."

But in the delegation of such authority the legislature must clearly mark the course to be pursued, and the principles, facts, and purposes to serve as guide posts to enable the officer to carry out, not his own will or judgment but that of the legislature. *Seignious* v. *Rice,* 273 N. Y. 44, 6 N. E. 2d 91; *Darweger* v. *Staats,* 267 N. Y. 290, 196 N. E. 61; *Noyes* v. *Erie & Wyoming Farmers Coop Corp.,* 170 Misc. 42, 10 N. Y. S. 2d 114; *Van Winkle* v. *Fred Meyer,* 151 Or. 455, 49 P. 2d 1140. The New York court under a similar state of facts, and with a statute much fuller and more definite than ours, answered the question with such definite and concise language that we quote it, not only with approval but as an exact reflection of our views. In *Noyes* v. *Erie & Wyoming Farmers Co-op Corp.,* cited supra, the court said [170 Misc. 42, 10 N. Y. S. 2d 122]:

"Here the fixing of minimum prices to producers of milk has not expressly been found by the Legislature to be a solution for the evils found to exist within the dairy industry, or been expressly incorporated

within the declared public policy in relation to those evils. In the absence of such express finding or declaration, the grant of power to the Commissioner to determine that the fixing of prices should be undertaken in the public interest under a declared policy silent in respect of price fixing, is a naked delegation of legislative power. It is he who makes the determination, essentially legislative in every repect from which it may be viewed, whether price fixing is a desirable public policy."

We find no cases upholding such a statute as this against a charge that it is a delegation of legislative power.

Is the provision for control of surplus milk void as a delegation of legislative power? Or in other words, has the legislature declared the control of surplus milk is a matter of public policy, provided for its control, and fixed the standards or purposes which are to control in regulating surplus milk? Has it authorized the establishment of a control plan or equalization fund such as is attempted in the orders of the Board here assailed? We shall discuss these two questions conjointly, because the question only becomes important when the Board attempts to control surplus milk, and then primarialy only to the extent it attempts to exercise the legislative power. The attempt to set up and enforce the control plan or equalization fund is a more flagrant assumption and exercise of legislative power than the price fixing orders. There is no provision, no authorization in the statute for an equalization fund; no provision requiring or authorizing a demand that one distributor contribute for the benefit of another, or that any consumer be required to pay for his milk an added price for the benefit of producers or distributors who do not contribute to milk he buys or the service of delivering it to him. There is no provision or authorization for the creation of a milk pool or requiring any one to participate therein. There is no declaration that the purposes of the act will be subserved by such control, or that it is the policy of the state to control it. There are no standards fixed for determination of when or what control should be exercised over surplus milk. The only provision as to control orders is that

they must not prohibit anyone meeting other requirements of law from producing or distributing. The New York Act, Chapter 383, Laws of 1937, (not the one involved in the Nebbia case, infra which was by its terms an emergency measure in force only for a short time), empowered the Commissioner (the administrative agent) to equalize the payments to all producers in the area by compelling dealers who collect moneys in excess of the average price in the area to deposit such excess in a fund to be paid to dealers who owe producers less than the average price, to be in turn paid to such producers. (Our statute contains no such provision.) It further provided that the price fixed was controlling on all when approved by seventy-five per cent of the producers. (Our statute doesn't even require approval by anyone except the majority of the Board.) *Nebbia* v. *People of State of New York*, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469.

What the New York Court had to say about this provision of their statute applies, for the reasons stated above, with double force to our set-up. That court said in *Noyes* v. *Erie & Wyoming Farmers Co-op Corp.*, 170 Misc. 42, 10 N. Y. S. 2d 114, 119:

"It is significant that the equalization provisions of the statute are not based upon any finding by the Commissioner, with or without evidence, that public interest requires that the policy declared by the Legislature shall be made effective by such equalization or upon any express declaration by the Legislature itself that such equalization of prices has any relation to the public policies elsewhere declared in the statute. * * * The only prerequisite to the promulgation of an order by the Commissioner setting up an equalization plan is the approval by seventy-five per cent of the producers affected. * * *

"All that seems necessary for the establishment of the equalization plan, under which dealers are compelled to pay their money or the money of their producers, to other dealers and other producers, is the mere arbitrary determination of the Commissioner and the arbitrary assent of the seventy-five per cent of the producers. The power to establish the equalization fund and to compel contributions to it is again a naked delegation of legislative power to the Commissioner and to the assenting percentage of producers who concur with him in the promulgation of the order, without any standard whatever, and

without express legislative declaration of finding or policy. A delegation of legislative power to a majority of producers constitutes as well an invalid delegation as one to an administrative officer. *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 311, 312, 56 S. Ct. 855, 80 L. Ed. 1160. See also discussion in *Highland Farms Dairy* v. *Agnew*, 300 U. S. 608, 614, 57 S. Ct. 549, 81 L. Ed. 835. A declared legislative policy, a standard for administrative action and a definite finding in the exercise of the authority conferred are each the necessary requisites for vesting of federal officers with the power to carry out the legislative policies of Congress. *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 415, 55 S. Ct. 241, 79 L. Ed. 446 [466]."

Again we say we have found no authority upholding any statute, authority, or rule like that here challenged. In these respects it must seem to follow that the statute and the orders and regulations of which complaint is made must yield to the paramount authority of the constitution.

The New Jersey court, in construing an act by its terms an emergency act and expiring by express limitation two months after the decision was rendered, pointed out that their act prescribed the purposes to be accomplished, the things to be remedied, fixed standards, defined policy, expressed the legislative objective to be arrived at in the prices fixed and which must govern the price. *State Board of Milk Control* v. *Newark Milk Co.*, 118 N. J. Eq. 504, 179 A. 116. So too the Pennsylvania court in *Rohrer* v. *Milk Control Board*, 322 Pa. 257, 186 A. 336, recognized the principle here laid down, pointing out that the Pennsylvania Act did contain and set forth the elements wholly missing in our law relative to fixing prices, and definitely declared that prices should be fixed according to standards and purposes therein laid down.

The Virginia Court in *Reynolds* v. *Milk Commission of Virginia*, 163 Va. 957, 179 S. E. 507, pointed out that the Virginia act expressly founded its fixing and control action and rules upon the interest and protection of the general public, and such interest and welfare and protection were

measuring rods in fixing the prices and other control regulations.

What we have said disposes of the point with reference to impairing obligations of contracts. If the Board cannot regulate prices or control surplus milk in the ways it has attempted to do, it must follow as of course that the order cancelling and voiding the contracts distributors had with producers is null and void.

The alternative writ heretofore issued is made permanent. Each side to pay their own costs.

MOFFAT, C. J., and PRATT, J., concur.

McDONOUGH, J., concurs in the result.

WOLFE, Justice (dissenting in part).

The act is unskillfully drawn, a fact all the more remarkable in view of the several statutes elsewhere carefully drafted and painstakingly construed by courts of last resort. But neither clumsy nor inadequately definitive language relieves us of our duty to search for the legislative intent or our duty to uphold the statute as against assaults on its constitutionality, if that can possibly be done. While the courts may desert the struggle to discern whether minds met in contract where the language is so inept as to make the task too onerous or speculative, acts of a coordinate branch of government cannot be so treated.

The court has not pressed into service sufficiently two kindred principles: (1) That legislative acts are to be held constitutional if there remains, after full analysis, a reasonable doubt, and (2) that the court is functus officio after it has passed on the power of the legislature. It cannot intermingle, consciously or unconsciously, a judgment of the wisdom of an act as a basis for a decision as to the power to pass it. I would be content to let this statement rest with those expressions were it not that I think we have in this, and several previous decisions, paid lip service to those principles but in reality have been influenced in our decisions,

not consciously, perhaps, by our opinion of the wisdom or fairness of the law. I think I detect in the prevailing opinion marks of such feeling.

"To say that the statute is not void beyond a reasonable doubt is to say that it is valid." Mr. Justice Cardozo in *Mayflower Farms* v. *Ten Eyck*, 297 U. S. 266, 278, 56 S. Ct. 457, 461, 80 L. Ed. 675: "To doubt is to decide in favor of its constitutionality." Judge Keller in *Rohrer* v. *Milk Control Board*, 322 Pa. 257, 260, 186 A. 336, 338. "The Legislature is primarily the judge of the necessity of the law, and every possible presumption in favor of its validity will be indulged." *State Board of Milk Control* v. *Newark Milk Co.*, 118 N. J. Eq. 504, 179 A. 116, 123: "Courts ought not to pronounce any act of the Legislature unconstitutional unless it is plainly so—so plain as to leave no doubt on the subject. To doubt is to affirm its constitutionality. There is no such theory as a doubtful constitutional statute. Every presumption is in its favor, and *there is no stronger presumption known to the law.*" (Italics added.) *Reynolds* v. *Milk Commission*, 163 Va. 957, 966, 179 S. E. 507, 510, *Id.*, Va., 177 S .E. 44. See Annotation 110 A. L. R. 644. Says Professor Frankfurter, now Mr. Justice Frankfurter, Vol. 16, A. B. A. J. 251, in speaking of Mr. Chief Justice Hughes' book titled "The Supreme Court of the United States: Its Foundation, Methods and Achievements": "* * * the success of the work of the Supreme Court in maintaining the necessary balance between state and nation, and between individual rights as guaranteed by the Constitution and social interest as expressed in legislation, has been due largely to the deliberate determination of the Court to confine itself to its judicial task, and, while careful to maintain its authority as the interpreter of the Constitution, the Court has not sought to aggrandize itself at the expense of either executive or legislature. * * * It depends on the self-denying ordinances of the Justices."

I spend no time on the question of whether, assuming the law to be constitutional, the Board lawfully established the marketing area or whether the rules and regulations promulgated were procedurally or substantially within its assumed powers, because I am given to understand that those questions are now moot, the Board having recently begun anew.

As to the contention that the Act deprives the plaintiff of property without due process of law in violation both of the Federal and State Constitutions: The right of the State

under the Federal Constitution to fix minimum prices to be paid to producers and to be paid by consumers is definitely set at rest by *Nebbia* v. *People of State of New York,* 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469. That decision founded on *Munn* v. *Illinois,* 94 U. S. 113, 24 L. Ed. 77, and *German Alliance Insurance Co.* v. *Lewis,* 233 U. S. 389, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189, held that the right of a state to fix prices did not depend on whether the business was monopolistic in nature or enjoyed a franchise from the state, nor did it depend on whether the business was affected or clothed with a public interest in the sense that its purposes were to furnish services universally used by the public such as, transportation, light, heat, water and power. The touchstone of public interest is whether the economic occasion is such as to make it desirable or necessary for the business to be regulated for the public welfare. Said the court:

"But there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells." 291 U. S. 502, 54 S. Ct. at page 516, 78 L. Ed. at page 957, 89 A. L. R. 1469.

In the concurring opinion in *McGrew* v. *Industrial Commission,* 96 Utah 203, 85 P. 2d 608, some criteria were suggested to enable determination by the courts whether that point had been reached in the march of private business, formerly prohibited from regulation by the due process clause, where the legislature properly could regulate it. It was there stated that when the legislature acted, because of that very fact, the presumption was that the point of social regulation had arrived. And "if the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio." *Nebbia* v. *People of State of New York,* supra.

.

"Circumstances may so change in time or so differ in space as to clothe with such an interest [that is, with a public interest] what at other times or in other places would be a matter of purely private concern," Mr. Justice Holmes in *Block* v. *Hirsh*, 256 U. S. 135, 155, 41 S. Ct. 458, 459, 65 L. Ed. 865, 16 A. L. R. 165.

There can no longer be any doubt that the 14th Amendment of the Federal Constitution, U. S. C. A., does not stand in the way of fixing milk prices. How stands it with Section 7, Art. 1 of our State Constitution? While the decisions of the highest Federal Court regarding the effect of the 14th Amendment on state legislation are not binding on us in determining whether our State's "due process clause" prohibits price fixing, they are highly persuasive. I think them not only persuasive, but convincing. The Court gives the "due process clause" a content which will not prohibit needed social or economic legislation. In the Nebbia case, Mr. Justice Roberts said:

"These correlative rights, that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the state to regulate the use of property and the conduct of business, are always in collision. No exercise of the private right can be imagined which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge his liberty or affect his property. But subject only to constitutional restraint the private right must yield to the public need."

We said somewhat the same thing in *State* v. *Mason*, 94 Utah 501, 78 P. 2d 920, 925, 117 A. L. R. 330:

"This balance between police powers and due process is, therefore, more or less in a state of unstable equilibrium, changing with sociological and economic developments. As the protection of the due process clause recedes, the police power advances. There is always articulation between the two."

The power to fix prices of fluid milk was in the legislature.

It is further urged that the order which, in effect, required all producers to pool their class A milk regardless of the use

to which it was ultimately put and accept a uniform blend price for the same was a violation of the due process clause. I prefer to treat this question in relation to the question later considered as to whether this power can be considered as being embraced in the general powers intended to be given the Board.

It is further urged that the fixing of a minimum price for sale to the consumer or store and the fixing of a blend price to the producer constitutes an impairment of the plaintiff's contract with his producers in that he must, under the blend price pay, to his producers a net of 44c per pound of butterfat, whereas he contracted to pay 48c a pound. Contracts are always entered into in view of, and are subject to, a proper exercise of the police power. *Rohrer* v. *Milk Control Board*, supra, 322 Pa. page 266, 186 A. page 341, quoting from the Nebbia case as follows:

" 'Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. * * *' "

Ordinarily, if the "due process clause" does not stand in the way of legislation, the "impairment of contract clause" will not so do. This Act, as far as it provides for the fixing of minimum prices, does not impair the obligation of contracts as meant by Sec. 10, Art. 1 of the Constitution of the United States, U. S. C. A. As to the constitutional effect of the pooling arrangement on plaintiffs' contract with his producers, the matter may better be considered when we determine whether such power to require pooling was given to the Board—that is, when we take up the topic of delegation of powers which is next to be considered.

The plaintiff contends that the power (1) to fix minimum prices; (2) to provide for control of the surplus of market milk; (3) to provide fair trade practices within the

marketing area; and (4) to exact payments to finance itself, were all improper delegations of power to the Board. Before these are considered, some general observation regarding the so-called delegation of powers are in order. It presents an immense and nebulous field for exploration. I think the statement that the legislature cannot delegate its power is unfortunate. In a measure that is exactly what it must and does do to permit administrative action. In England the powers of administrative agencies are spoken of as "delegated powers." The phrase was quite understandable and even interpretable in the days of simpler economic conditions when modern governmental administration had not yet been born or was in its infancy. Then the legislature could, by definite standards and with fair accuracy, delimit the field leaving "detail to be filled in." But what was really meant by the courts in holding that "delegation of power" was invalid was that legislative power should not be surrendered; that legislative policy should be stated; and that guides and limits to the administrative policy should be supplied. Certainly the power to "abolish unfair methods of competition" given the Federal Trade Commission does little more than enunciate a policy. The Commission must, by concrete experience, learn what are unfair methods as they effect the public and, subject to review by the courts in a series of decisions, establish standards of fair and unfair methods of competition. True it is that the Federal Trade Commission can only issue cease and desist orders but not enforce them. In that sense its power is in effect limited to the fact finding field. Any commission which acts as a legislative agent with so-called quasi-legislative powers, has legislative powers delegated to it. Mr. Chief Justice Allen in the case of *Ferretti et al.* v. *Jackson et al.*, 88 N. H. 296, 188 A. 474, 476, sensed that when he stated:

"Rules and regulations validly made by such an agency are in actuality laws. They correspond to municipal ordinances. They are directions and orders of conduct, at least when other than of course or procedure, and meet all tests and definitions of law. The duty and obligation of compliance is created and imposed by the authority and

force of public government. If subsidiary to a broader or more general law and an aid to enforcement, that may be the condition upon which their validity depends, but it does not affect their standing as laws in true comprehension. They may be conveniently classified, for their special features and distinguishing words may be used to designate their special character. Their identity as laws nevertheless remains."

It is said "in application it is often difficult to draw the line between general legislation which is not delegable and that which has such executive attributes that the Legislature constitutionally may give authority to the enforcing agency to ordain it." *Ferretti* v. *Jackson*, supra. I venture the assertion that the delegation allowed is such as the occasion requires, and the further assertion that the matter is confused by the endeavor to give to administrative performance the distinguishing characteristics of legislative, executive and judicial. The truth is that it is because of the very necessity of departing from the rigidity of separation of powers into these three categories that administrative agencies must be established. It is impossible, in the development of a program of a declared policy of regulation many times, to say where the legislative ends and the executive begins. He indeed is to be congratulated who can pick out the legislative, the executive, and the judicial ingredients of many completed administrative processes. But to do so and label them would be useless labor. They are *administrative* acts which involve, in many cases, an inextricable admixture of all three functions. "While in facility of language we say that the Legislature has the power of regulation as a form of the police power, strictly it has only the power to provide for regulation, the actual control under regulation being administrative." *Ferretti* v. *Jackson*, supra. But in certain situations it is necessary to give the administrative the power even "to provide for regulation." It depends upon the nature and scope of the economic, social, or political problem which is to be administratively handled. Dean Landis states in his "The Administrative Process," page 51:

"It is difficult to assess the importance of insisting upon definite standards. The area of their appropriate use is certainly not deducible from a reading of the judicial literature dealing with constitutional limitations upon the right to delegate power. Unhappily, this tends to become dogmatic, emphasizing too much the language of delegation rather than its purpose. It casts doubt upon the validity of certain ways of delegating power more because of the manner of expression than because of the scope of power. * * * The distinctions in the scope of administrative power as they come to the surface in legislation at this period of our development derive little from theory. Rather the facts upon which the legislation operates determine the given areas of discretion."

It was recognized in *Tite* v. *State Tax Commission*, 89 Utah 404, 57 P. 2d 734, that a strict separation of powers was impossible in the functioning of those branches of government definitely legislative, executive and judicial. See also, "Power of Congress over Procedure in Criminal Contempts in 'Inferior' Federal Courts—A Study in Separation of Powers," by Frankfurter and Landis, 37 Harv. L. R. 1010 et seq. As definitive law converges into action through administrative agencies it is ofttimes impossible to separate the nature of the functions. To endeavor to do so would be the pastime of the legal pedant and not the task of the administrator. When the Federal Trade Commission initiates or institutes a proceeding, holds a hearing, makes findings, concludes whether acts are "unfair methods of competition" and issues a cease and desist order it has exercised, in the hearing and decree, judicial powers while in pursuit of its general executive power to abolish abuses and, in concluding that certain practices constitute "unfair methods of competition," it, in effect, formulates a rule that such methods are unlawful as meant by Congress and thus may be exercising legislative functions. Examples of the admixture of the three functions necessary to one complete action of an administrative agency or of their exercise separately at different times over any given period of administrative performance could be endlessly multiplied. The moral is: That there are and must be for governance, broad delegations of

legislative power which when exercised, take on the flavor of both judicial and executive—and it subtracts not at all from this truth that we may call the powers quasi-legislative and quasi-judicial. This is by way of recognition of a fact and not by way of advocacy. The will of the people which is expressed by the legislature is a primary will; all that is within that primary will, as thus expressed, may be exercised by an administrative body. The area of action should be suited to the purposes to be accomplished. The policy and the guides, which are themselves sometimes limits, supply the bounds for the secondary expression of that will. It may take only slight delegation of power to require directed operation along a narrow ribbon of permissible administrative action as in the early Interstate Commerce Commission Acts. On the other hand, the delegation may permit a discretionary choice of action over an area so broad in its scope as to be practically commensurate with the economic limits of the problems to be handled.

"Generalization as to the allowable limits of administrative discretion is dangerous, for the field is peculiarly one where differences in degree become differences of substance. It is possible to say, on the one hand, that the responsibility for fashioning a policy, not only of great economic importance but also one that has divided the faiths and loyalties of classes of people, cannot appropriately be intrusted to the administrative; on the other, that the scope of administrative power should not be so narrowly defined as to take away from the administrative its capacity to achieve effectively the purposes of its creation. Such corollaries, however, are meaningless in the abstract. It is problems alone that can give them content, but the content that they should possess must have reference to situations seen in the light of the weaknesses and strength of administrative responsibility." Landis, The Administrative Process, p. 55.

And with this preface I approach the consideration of the concrete problems on hand:

Section 4(b) (5) reads:

"*   *   *   the board may,   *   *   *
"5. Provide, fix, and regulate a minimum market price for market milk. Such a minimum market price shall be construed to include the

price paid by distributors to producers for their product and the price paid by purchasers of milk for resale to distributors as well as the ultimate retail and wholesale prices to consumers. This price shall be the current market price and in determining this price the board shall consider the prices of other dairy products as well as the cost of producing, handling, pasteurizing, and distributing the product which is ultimately sold to the consumer."

It does not provide for the fixing of a price to producers but provides that the price paid to producers shall be included. In determining the price the Board shall consider the prices of other dairy products as well as the cost of producing, handling, pasteurizing and distributing the product which is ultimately sold to the consumer. I read the words "shall consider" to be equivalent to "shall be guided by." While the language might be more definite it furnishes a standard for fixing prices as definite as that provided by other acts which have been upheld as not beyond the scope of permissible delegation. The New Jersey Milk Control Act, P.L.N.J. 1933, p. 353, held not to involve delegation of authority that is essentially legislative, directed the agency, in the exercise of its power to fix milk prices, to consider the various grades of milk produced, the varying percentages of butterfat, plant volume, seasonal production and other conditions affecting the cost of production, cost of transportation and marketing and the price necessary to yield a reasonable return to the producer and to the milk dealer. Our law, while not so specific, appears to intend much the same criteria. See also similar standards in the Pennsylvania Act, Act Pa. Jan. 2, 1934, P. L. 1933-34, Ex. Sess., p. 174. *Rohrer* v. *Milk Control Board,* supra, 322 Pa. at page 278, 186 A. 336. In the Indiana Act the Board was given power to determine the minimum prices to be paid by all licensed dealers for each classification of milk produced and furnished for consumption in any marketing area and was to be guided by factors similar to those set out in Sec. 4(b) (5), supra. The court, in *Albert* v. *Milk Control Board,* 210 Ind. 283, 200 N. E. 688, 694, held that the Act did not unconstitutionally delegate legislative powers:

"The rule in respect to the delegation of legislative power is well stated in *Locke's Appeal*, 72 Pa. 491, 13 Am. Rep. 716, as follows: 'Then, the true distinction, I conceive, is this: The Legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend, which cannot be known to the lawmaking power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation.' "

In *State Board of Milk Control* v. *Newark Milk Co.*, supra the court said:

"The plainly expressed legislative objective is the maintenance of a price level that will yield only a reasonable return for the producers' labor and investment, and thus insure an adequate supply of wholesome milk. To the administrative agency is committed the effectuation of this definitely expressed policy, soundly based in economics, to preserve this vital food industry by the maintenance of this price level. Such is the extent and limit of its authority. There is therefore no delegation of the exclusive legislative function. The statute is complete in itself. There is obviously no attempt to vest in the respondent board authority that is essentially legislative. It reposes in it the administrative function only, and this was concededly within the competency of the Legislature."

In *Jersey Maid Milk Products Company* v. *Brock*, 13 Cal. 2d 620, 91 P. 2d 577, 595, the court held that adequate standards were provided where it was required that the price designated should be based upon the "economic relationship of the price of fluid milk for the marketing area involved to the price of manufacturing milk" and that the prices fixed should tend to effectuate the "purposes and policy of this chapter" and "will insure consumers a sufficient quantity of pure and wholesome milk." Certainly the standards there set were more indefinite than those set by Sec. 4(b) (5).

*Ferretti* v. *Jackson*, supra, is easily distinguishable. Sec. 9 of Chapter 21, Session Laws 1935 of New Hampshire, reads:

"The board, after receiving such application, may, after due public notice hold a hearing and investigation, define the market, *fix just and reasonable minimum* wholesale and retail prices to be charged for milk in such market, may fix different minimum prices for different grades of milk and may fix just and reasonable maximum prices to be paid producers by distributors." (Italics added.)

There was no further or other standards.

In *United States* v. *Rock Royal Co-operative, Inc.*, 307 U. S. 533, 59 S. Ct. 993, 1013, 83 L. Ed. 1446, it was said:

"* * * In dealing with legislation involving questions of economic adjustment, each enactment must be considered to determine whether it states the purpose which the Congress seeks to accomplish and the standards by which *that purpose is to be worked out with sufficient exactness to enable those affected to understand these limits.* Within these tests the Congress needs specify only so far as is reasonably practicable. The present Act, we believe, satisfies these tests." (Italics added.)

In *Rohrer* v. *Milk Control Board*, supra, 322 Pa. 277, 186 A. 345, we read:

"As to the objection that the statute delegates legislative power to the milk control board, that gives me little concern or anxiety. Courts which have accepted as constitutional the Public Service Company Law and the Anthracite and Bituminous Mine Codes, and the acts giving authority to the Department of Labor and Industry and the Department of Health to adopt rules and regulations, etc., (see *Gima* v. *Hudson Coal Co.*, 106 Pa. Super. 288, 299, 161 A. 903), should not strain at the powers given the Legislature's agent, the milk control board, under this act. A moment's consideration must convince an open mind of the impracticability of the General Assembly itself conducting the hearings and arriving at the conclusions necessary for fixing fair rates for producer, distributor, dealer, and consumer in widely scattered and wholly dissimilar sections of the state. It has set forth in plain and unmistakable language the basic *purposes* and *primary standards* which it has in mind in an attempt to remedy the mischievous conditions which are present in the milk industry, a continuance of which threatens the welfare and well-being of the whole people; and, having done so, it may lawfully appoint the board its agent upon whom devolves the duty to carry out the legislative policy. It has not delegated its power to make law, but has delegated the power to determine facts and apply the intention of the Legislature to conditions

thus determined. To make use of any agency adapted to put into effect the details which it would be impracticable for the Legislature to look after is not making the agent a legislative body nor acting in violation of the constitutional provision." (Italics added.)

I find the Pennsylvania Milk Control Act, while more expertly drawn, contains guides hardly more definite than our own.

Says the prevailing opinion:

"We have noted these various missing parts to show the utter barrenness of the statute."

The "missing parts," as I glean from the opinion, are that there is "No procedure for price fixing" except a petition "asking that prices be fixed." But that does not concern delegation of powers. There is no complaint on the procedure preceding the fixing of prices. It was held in *State Board of Milk Control* v. *Newark Milk Co.*, supra:

"The claim that the prescription of minimum prices, 'without an investigation by the control board of the milk industry and without notice to the defendant or opportunity afforded it to be heard,' constituted a deprivation of constitutional rights is untenable. In the absence of a specific constitutional or statutory requirement thereof, notice of proceedings before the subordinate body exercising, as here, the administrative function is not requisite to valid action by that body. Nor is a hearing required in the absence of a provision therefor in the organic or statutory law. The due process clause of the Fourteenth Amendment imposes no such requirement; and, for obvious reasons, the like clauses in the state Constitution bear the same construction."

I need not commit myself at this time to the extent of the New Jersey Court, because the question of whether the Board acted constitutionally in procedure precedent to the fixing of minimum prices has become moot.

The second "missing part," it seems, is that the Act contains nothing "as to what conditions must be found to justify price fixing." It would seem to be fairly inferable from the preamble and the provisions of the Act that the "con-

dition" was the state of the milk industry. Another "missing part" is that nothing is said as to what constitutes a fair price. No limits are set as to how "high or how low the price may be." But the very function of the agency is to find and fix a fair price. How can high or low limits be set? The guide is: The price paid to producers, plus cost of handling, pasteurization and distribution. Only a minimum need be set. Competition will make that the maximum. Another guide is also furnished, i. e., the prices of other dairy products. In *McGrew* v. *Industrial Commission,* supra, the Minimum Wage Law was held constitutional although no high or low wage limits were named. How impossible it would be for the Legislature to name in the Act anything but meaningless high or low limits for milk. All that could be done would be to make a low limit far below any reasonable minimum and a high limit above any reasonable maximum—to do so would be quite purposeless.

The next "missing part" seems to be absence of mentioned "objectives, purposes, standards, measures, or gauges." And there is "no declaration or statement of policy that regulation by price fixing is in the public interest." I have already endeavored to show that a standard is provided specific enough to pass challenge. While in modern social legislation a preamble declaring objectives, purposes, policy and the conditions which require the legislation is to be encouraged, it is not necessary. Time was when the purposes of the legislature had to be gathered from the content of its operative provisions. But this Act states in its preamble that the production and distribution of milk is vested with a public interest and states the reasons why. We should not need to be told this by law. Judicial knowledge should supply the information that all over the country a very vital industry has been threatened with destruction because of the ruthless competition due to over-supply of milk in the various metropolitan milk sheds, due in turn to quick transportation which has enlarged the areas of production which supply those metropolitan areas and to improved methods of

handling milk. Sanitary ordinances to prevent contamination have required increased capital investments by producers in an industry which, because of varying production due to seasons, the nature of the cow, feed conditions, and varying demands by the great number of consumers from day to day, requires stabilization. The revelations contained in the 473 page report of the "Joint Legislative Committee" created by the New York Legislature are largely applicable to the milk industry generally throughout the country. And regulation of the milk industry is not a new thing. Since 1862 no industry, except railroads, has been so thoroughly regulated in the State of New York. "It is [a matter] of common knowledge that the milk supply is affected with a public interest and has a direct relation to public health and the general welfare of the people." *Albert* v. *Milk Control Board*, supra. While neater draftsmanship might considerably have improved Sec. 4(b) (5) of Chapter 7, Laws of Utah 1937, it does contain a definite guide. No declaration of legislative policy or purposes is necessary because the objectives are revealed by what the Act seeks to accomplish, and our judicial knowledge should supply the objectives. But the preamble gives us the clue, if any is needed.

The next "missing part" seems to be that there is no legislative finding "that the regulation of prices offers any solution to any undesirable conditions which might be in the industry, or that any conditions existing in the industry are to be remedied by price fixing" and there is "no * * * declaration of any relationship between price and continuous supply." Is not this mere logomachy? Certainly such finding is implied. The legislature would not speak of stabilizing production and distribution, and fixing prices in the same Act without having concluded that there was a definite relation between the two. It is tautology to state that there is always a relation between supply and price. Does it need to be stated in legislation? Moreover, our knowledge of administrative law has progressed at least to the point where we know that legislatures must ofttimes, by the very

nature of the thing they desire to regulate, leave to the agency appointed the determination of whether the conditions exist which require the application of the regulation. Our Minimum Wage Law did exactly that. The Securities and Exchange Act of 1934, 15 U. S. C. A. § 78a et seq., providing for a Commission to regulate the sale and exchange of securities, leaves it largely to the Commission to discover the specific evils which affect the business. Congress could do no other. Perhaps a little interpretative imagination might supply us with the idea that most of the "evils in the milk industry" have some relation to price. Does it not appear sufficiently clear from the Act that the Legislature must have determined that regulation and stabilization of prices would aid in solving the "undesirable conditions which might be in the industry" and that such regulation of prices would be in the public interest? "The Legislature is primarily the judge of the necessity of the law," *State* v. *Newark Milk Co.,* supra. It does not need to say specifically that it deems the law necessary. Legislation will be presumed to be in the public interest. See concurring opinion in *McGrew* v. *Industrial Commission,* supra.

The prevailing opinion quotes copiously from, and relies on the case of, *Noyes* v. *Erie & Wyoming Farmers Co-op Corp.,* 170 Misc. 42, 10 N. Y. S. 2d 114, a case decided by a court of equal dignity with our District Courts. Suffice it to say that this case has been reversed by the Court of Appeals of New York, *Id.,* 281 N. Y. 187, 22 N. E. 2d 334.

The writer believes he has examined every case where a Milk Control Act has been before a court of last resort and in none, where the guides to price fixing were so definite as in this Act, was the Act, held on that account unconstitutional. Acts for control of the milk or ice cream industry were held unconstitutional in the following cases: *Ferretti* v. *Jackson,* supra. *Van Winkle* v. *Fred Meyer, Inc.,* 151 Or. 455, 49 P. 2d 1140, and *Maryland Co-operative Milk Producers* v. *Miller,* 170 Md. 81, 182 A. 432. In the first, the Act was extremely scanty. A reading of the Van Winkle

case, which fell under the ruling of *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, 55 S. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947, will convince the mind, by comparison, of the constitutionality of our Act. The ruling in the Maryland Co-op case is against the ruling in every other jurisdiction and is the one case which can be said to support the prevailing opinion.

The provision that the producers and distributors of market milk shall pay to the administrative agencies such sum as the board may order, not to exceed a certain maximum and not to exceed the amount actually necessary to defray necessary expenses of administration, is clearly a constitutional delegation of authority. It is not contended that the maximum is unreasonable. The legislature has authority, of course, to require fees reasonably necessary and incidental to pay for the cost of administration. The authority given to the agency to raise such expenses by fixing fees below a reasonable maximum is designed to more accurately articulate actual collections with necessary expenses. Authority should not be necessary to establish this principle but there is definite and direct authority sustaining such delegation. *Reynolds* v. *Milk Commission,* supra.

We come now to the most difficult question in this case: In attempting to effectuate the Act the Board provided for an equalization fund which amounted to treating all Class A milk sold to consumers or to distributors as though it were, in effect, pooled. The producer then received a "blend" price for this "pooled" milk, regardless of the use to which it was put. Nowhere is there in the Statute an express grant to establish an equalization fund as we find in most, if not all other Milk Control Laws. If it is within the Board's prerogatives, it must be embedded in some more general power as a means reasonably suited to carrying into effect such power or must be gathered by implication from the whole of the Act.

More specifically it must be found in Sec. 4 (b) (2), which reads:

"(b) * * * the board may, * * *

"2. Provide for the control of surplus market milk, provided that such order shall be fair so as to give to all producers and distributors of market milk an equal opportunity to produce and distribute market milk; the orders to be made under this section should have for their ultimate end the providing of an adequate supply of pure, wholesome milk and at the same time prevent the creation of any surplus of market milk in the trade area for which the order is promulgated."

This, perhaps, is an example of an expression of legislative policy without sufficient indication of methods to achieve it. The policy expressed is to control the supply of surplus market milk, circumscribed by the requirement merely that all producers have an equal opportunity to produce and all distributors have an equal opportunity to distribute. Certainly any control of the supply of surplus milk must reach back to the producer. The Board might arrange to dispose of the surplus at manufacturing prices but this would not "control" the supply. If the equalization fund were the *only* method of control it might then be valid on the theory that it must have been in the contemplation of the Legislature. A seeming general power that can be exercised in only one possible way may, by that fact, be revealed to be specific. But I am unable to say that the blend price scheme is the only method of control which will give equal opportunity to all producers and distributors. It is possible to conceive of a plan of control by limiting each producer to a surplus based on his average production over a certain period, with a pooling arrangement for temporary deficiencies among all producers and adjustments for newcomers in the field and for those dropping out. It may be possible also to control surplus by requiring the destruction of some milk with or without compensation. Whether any of these plans would be practical or valid is beside the point. There is, therefore, more than one method of controlling the surplus. And if so, it cannot be said that a power very general in terms is, by practical operation, capable of only one definite method of fulfillment.

Certainly the blend price method seems the most practical. The way it works may be demonstrated best by a concrete example. Over a certain period, milk with 100,000 pounds of butterfat content is shipped into the market, 50,-000 pounds of which is sold as market milk at a fixed price of 11c a quart to the consumer. The Board fixes a base price of 54c per pound butterfat to the producer for the milk so sold. Of the remainder of the milk, 25,000 pounds is sold as cream, and 25,000 pounds for butter, cheese or ice cream. The price for milk sold for these uses is fixed at 40c and 32c per pound of butterfat, respectively. The blend price paid to the producer for all milk, without subtracting administration costs is, therefore, under our illustration.

$$\frac{(50,000 \times 54) + (25,000 \times 40) + (25,000 \times 32)}{100,000}$$

or 46.75c per pound butterfat.

Since, under our illustration, 50,000 pounds of the total 100,000 pounds is sold as fluid milk, the producer who has sold *more* than half of this total milk as fluid market milk, either directly or through a distributor, will be contributing to the equalization fund for the benefit of the producer who has sold *less* than half his milk to the store or at the doorstep. It is doubtful whether the producer may complain because of this apparent taking from Peter to pay Paul, because of the fact that he shares in the benefits of the minimum price which the consumer must pay for market milk, a price which is fixed not for any particular producers' benefit but for the stabilization of the whole industry. Even if he could show a financial loss as compared with a lower unfixed price at which he formerly sold to the consumer, it is doubtful whether he could cry that he was not accorded "due process," if it could be shown that the public interest of a stabilized industry required that he take less, and it did not appear that he was not making a reasonable return on efficiently run and reasonably assessed plant value. But such

speculations are for the future. By a glance at the factors in the above equation, it will be noted that if the sales for market milk remain fairly constant, an increase in the total milk that comes on the market increases the surplus which finds its way into manufacture, and the blend price consequently goes down. Conversely, if less milk comes on the market the blend price goes up. Thus there is an incentive to the numerous producers to keep their herds within bounds so as to get a reasonable return. If the blend price they actually receive stays down over any considerable period, they will curtail their herds. If it goes up over a period, they are likely to increase their herds or new producers will enter the field. Hence, the equalization fund does seem to be a governor acting to stabilize the market milk supply. I think a fair argument might be made that this plan is impliedly included in the power to control, subject to the requirement that all producers be treated equally. But there are arguments the other way. The fixed price to the consumer contains the idea of an exaction upon him. The equalization fund method involves a method of distributing such exactions. Even though the method of distribution of this exaction as part of the distribution of the whole fund tends to control surplus, there may be some doubt whether it can be done under a general power to control surplus without designating such method. "The field is peculiarly one where differences in degree become differences in substance." Here the powers granted are as broad as the policy stated. Narrow the scope by a recitation of methods, and questions of unconstitutional delegation may disappear. But since the law is to be declared unconstitutional and must be redrafted and passed by the Legislature if we are to have lawful control of the milk industry, I need not definitely conclude as to this phase of the case. In the growing field of administrative law, unnecessary concrete commitments should be sparingly made. I presume the new statute will be more definite in regard to methods. It is in the hope that this discussion may be of future aid that I have included it in

this opinion and have more elaborately dwelt on some of the questions presented when such general power is unaccompanied by definite methods for its fulfillment.

From what has been said it follows that I cannot agree that the Act is unconstitutional on the grounds set out in the prevailing opinion. The Board may be so constituted as to be without consumer representation or be overweighted with producers and distributors whose price fixing might, under the guise of law, be as self-serving as if they had combined to control prices. But we cannot so assume. If so, the remedy is political. We must assume the Act is for the purpose it purports to be—to save the industry whose existence is a vital necessity to the public. The purpose is implicit in the Act. It needs no declaration to reveal it.