H. V. Noyes, as Commissioner of Agriculture and Markets of the State of New York, Plaintiff, *v.* Erie & Wyoming Farmers Co-operative Corporation, Defendant.

H. V. Noyes, as Commissioner of Agriculture and Markets of the State of New York, Plaintiff, *v.* Trevett Co-operative Assn., Inc., Defendant.

H. V. Noyes, as Commissioner of Agriculture and Markets of the State of New York, Plaintiff, *v.* Sterling Amherst Farms Dairy, Inc., Defendant.

H. V. Noyes, as Commissioner of Agriculture and Markets of the State of New York, Plaintiff, *v.* Arthur E. Landel, Doing Business as Williamsville Dairy, Defendant.

Supreme Court, Special Term, Albany County, February 21, 1939.

*Milo R. Kniffen, Counsel to the Department of Agriculture and Markets [David O. Chambers of counsel], for the plaintiff.*

*Merwin, Paul, Lesswing & Hickman,* for the defendant Erie & Wyoming Farmers Co-operative Corporation.

*Robert I. Millonzi,* for the defendant Trevett Co-operative Assn., Inc.

*Staley, Tobin & Manley [Henry S. Manley* of counsel], for the defendants Sterling Amherst Farms Dairy, Inc., and Arthur E. Landel.

*Jesse S. Raphael,* for the Consumer-Farmer Milk Co-operative, Inc., *amicus curiæ.*

BERGAN, J.   By chapter 158 of the Laws of 1933 (adding art. 25 to Agriculture and Markets Law)▮ the Legislature declared the existence of an emergency in relation to the production, sale and distribution of milk in the State.   The act established a Milk Control Board vested with broad jurisdiction over the dairy industry, including power to fix prices which "will best protect the milk industry in the State and insure a sufficient quantity of pure and wholesome milk to adults and minors." (§ 312, subd. [a].)   The powers conferred terminated, by express provisions of the act, on March 31, 1934.   (§ 319.)   The provisions of the emergency enactment were continued by subsequent enactments in 1934, 1935 and 1936, each based upon the legislative declaration of a continued emergency.   The constitutionality of these emergency powers was challenged and upheld by the Court of Appeals (*People* v. *Nebbia*, 262 N. Y. 259) and by the Supreme Court of the United States (*Nebbia* v. *New York*, 291 U. S. 502).   The decision in each case turned in part upon the legislative finding that an emergency existed in New York in the production, distribution and sale of milk.

By chapter 383 of the Laws of 1937 (adding §§ 258-k–258-n to article 21 of Agriculture and Markets Law, which article was added by Laws of 1934, chap. 126) the Legislature made a new declaration of public policy in respect of the dairy industry of the State.   This was not based upon an emergency found or declared by the Legislature, but was founded upon a general declaration, apparently permanent, of facts in relation to the dairy industry. These findings (Agriculture and Markets Law, § 258-k) were that the dairy industry "is a paramount agricultural industry of this State;" that the "normal" (as distinguished from the prior "emergency") processes of producing and marketing milk "have become an enterprise of vast economic importance to the State and of vital interest to the consuming public which ought to be safeguarded and protected in the public interest."

Upon these findings it is declared to be the policy of the State "to promote, foster and encourage the intelligent and orderly marketing of milk through producer-owned and controlled cooperative associations."   There follows immediately upon this declaration of policy a further legislative finding of factual conditions, that unfair, unjust, destructive and demoralizing trade practices have been "and are likely to be" carried on in the milk industry. There follows after this further finding a further declaration of policy that it is a matter of public interest for the State "to promote the orderly exchange of commodities" and, in co-operation with

the Federal government, " to take such steps as are necessary and advisable to protect the dairy industry and insure an adequate supply of milk for the inhabitants of this State." It is apparent that the findings by the Legislature, as distinguished from its declaration of public policy, are three: (a) That the dairy industry is a paramount agricultural industry; (b) that the normal processes of that industry are of economic importance to the State and of vital interest to the consuming public; (c) that destructive trade practices have existed in the past and are likely to continue in the future. These findings constitute the factual bases, as expressed by the Legislature, for the declared public policy.

The statute vests in the Commissioner of Agriculture and Markets the power to fix minimum prices to be paid to producers of milk in " marketing areas " in the State. Also vested in him is power to equalize the payments to all producers in the area by compelling dealers who have in their hands money due producers in excess of the average price in the area to deposit such excess in a fund to be paid to dealers who owe producers less than the average, in turn to be paid such producers. The procedure by which the Commissioner makes his determination of minimum prices is provided by the statute. (§ 258-m.) He acts upon the petition of a " producers' bargaining agency " of the production area supplying a marketing area — each of which terms is defined in the statute — alleging the existence of conditions " so affecting the orderly marketing of milk in such area that public interest requires regulation of prices of milk " therein " in order that the public policy declared in section two hundred and fifty-eight-k " shall be effective. (§ 258-m.)

It should be noted that the Legislature makes no finding in section 258-k that the regulation of prices of milk offers any solution to the other conditions found, and the statements of policy contain no express declaration that such regulation by fixing prices is in the public interest. It is the petition of the producers' bargaining agency alleging the existence of conditions in the area described and alleging that public interest requires " regulation of prices of milk in such area in order that the public policy * * * shall be effective," that initiates the administrative proceeding for the regulation of prices. The Commissioner's duty thereupon is to call a public hearing by proper notice " at which the applicants and other persons, including producers, distributors and consumers and associations thereof, may be heard." (§ 258-m.)

After such a hearing, if the Commissioner shall find, either from the testimony given at the hearing " or upon information concerning conditions existing in the milk industry in such marketing area which the Commissioner has otherwise obtained," that conditions

exist therein so affecting the orderly marketing of milk that public interest requires that the public policy declared by the Legislature shall be effective and that it is favored by at least seventy-five per cent of the producers of milk produced in the production area, he may, by order, fix and determine for such area " fair and equitable minimum prices to be paid to producers." (§ 258-m.) Again, the Legislature does not state as a finding or policy that conditions found in the dairy industry are to be remedied by price fixing, but authorizes the Commissioner to find that the declared statutory public policy which, as has been pointed out, itself makes no express reference to price fixing " shall be effective." The statute thereupon authorizes him to fix minimum prices to producers. Any price fixed or approved by the Commissioner shall be deemed *prima facie* reasonable.

There follows upon this statutory authority to fix minimum prices to producers a broad delegation of power to the Commission to equalize, among producers in the area, prices paid in excess of the declared minimum. This is accomplished by an ingenious mechanism of establishing an average and by taking away money from those above the average and giving it to those under it. It is the governmental compulsion of this process and the means by which it is accomplished that are largely challenged by these defendants as invasions of their constitutional privileges and immunities.

The statutory mechanism provided for the equalization fund is a direct authorization to the Commission to provide in " any order " fixing the prices to producers, if approved by seventy-five per cent of the producers affected, for an equalization of prices to all producers of the production area of the market affected " so that each producer or co-operative association shall receive the same base price for all milk delivered subject to reasonable differentials for quality and location and for services." (§ 258-m, subd. 6.) This equalization plan is made operative upon the basis of a monthly report from each dealer receiving milk from producers, which the Commissioner shall require to be filed with him showing the disposition of all milk handled by such dealer in that market. The Commissioner " shall thereafter require payment by each dealer, to a trust company designated as a fiscal agent for the Commissioner, of any amount by which the sum otherwise due by such dealer to its producers in accordance with the prices fixed by such order exceeds the equalization base price as determined by the Commissioner from such reports, which amounts so paid to said fiscal agent, the Commissioner shall direct to be paid to those dealers whose reports show that the base prices they will pay their pro-

ducers in accordance with such order are less than the equalized
base price as so determined by the Commissioner." Such dealers
are then required to pay to their producers such amounts " so as
to bring all lower rates of payment up to the equalized base price."

It is significant that the equalization provisions of the statute
are not based upon any finding by the Commissioner, with or
without evidence, that public interest requires that the policy
declared by the Legislature shall be made effective by such equaliza-
tion or upon any express declaration by the Legislature itself that
such equalization of prices has any relation to the public policies
elsewhere declared in the statute. In this respect it differs from
that part of the order which fixes minimum prices, which must be
based, at least, on some finding by the Commissioner. The only
prerequisite to the promulgation of an order by the Commissioner
setting up an equalization plan is the approval by seventy-five
per cent of the producers affected.

By the provisions of section 258-e the Commissioner is authorized
to institute " such action in law or in equity as may appear neces-
sary to enforce compliance with any provision of the statutes, rules
and orders committed to his administration," and is permitted to
apply for relief " by injunction if necessary to protect the public
interest without being compelled to allege or prove that an adequate
remedy at law does not exist." The Commissioner has instituted
four actions against distributors within the Niagara-Frontier milk
marketing area, which is made up of the city of Buffalo and certain
other cities and towns in Erie and Niagara counties. The com-
plaint in each action alleges that the Commissioner has acted in
pursuance of the statute in making an order for a minimum price
to be paid to producers of milk in the area; that such order contained
an equalization provision; and that reports made by each defendant
disclose that amounts are due from such defendant as distributor
to the equalization fund which have not been paid. Injunctive
relief is sought restraining the defendants from violating the pro-
visions of the order; affirmative relief commanding them to comply
with it is sought, and, in addition, a money judgment is asked in
favor of the Commissioner as plaintiff against each defendant for
the amount computed to be due by such defendant to the equaliza-
tion fund. Plaintiff applies at Special Term for an order for a
temporary injunction granting during the pendency of the action all
the injunctive and mandatory relief sought in the complaint.
The defendants, by cross-motion, move to dismiss the complaint
upon the ground that it fails to state facts sufficient to constitute a
cause of action, that it is insufficient in law, and raise the question
of the constitutionality of the statute under which the equalization
order now sought to be enforced was promulgated.

The power of the Legislature in this State to regulate the dairy industry in the public interest, and, as an incident to that power, to fix prices, is undoubted. I think this follows whether a temporary emergency or a dislocation of permanency is the subject of the regulation. Its power has been said not only to extend to the regulation and encouragement of the production of milk " but also, when conditions require, to regulate the prices to be paid for it, so that a fair return may be obtained by the producer and a vital industry preserved from destruction." (*People* v. *Nebbia, supra*, p. 272.)

From the regulation of prices to the establishment, in the interests of public welfare, of mechanics for the equalization of prices paid to producers in a given area under proper safeguards is not a very far step, and not one which necessarily passes the threshold of constitutional immunities. The ends sought are identical, the means similar in principle. Ingenious novelty alone is not a fatal objection, for the Court of Appeals in the *Nebbia* case said further (p. 270): " But we must not fail to consider that the police power is the least limitable of the powers of government and that it extends to all the great public needs; that constitutional law is a progressive science; that statutes aiming to establish a standard of social justice, to conform the law to the accepted standards of the community, to stimulate the production of a vital food product by fixing living standards of prices for the producer, are to be interpreted with that degree of liberality which is essential to the attainment of the end in view * * * and that mere novelty is no objection to legislation."

When the *Nebbia* case came to the Supreme Court of the United States it was considered largely in the light of its purported conflict with the due process clauses of the Federal Constitution, and, in discussing the Fifth Amendment in the field of Federal activity and the Fourteenth in the field of State action, Mr. Justice ROBERTS said (p. 525) that these amendments " do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. * * * The reasonableness of each regulation depends upon the relevant facts;" and, further (p. 536): " It is clear that there is no closed class or category of businesses affected with a public interest, and the function of courts * * * is to determine in each case whether circum-

stances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory." Accordingly, it was held that, upon the basis of the Legislature's findings of an emergency and of conditions in the dairy industry in the State affecting the public welfare, price regulation to prevent destructive practices adversely affecting the public welfare was not in that instance an invasion of the constitutional rights of the parties adversely affected.

It is urged by the defendants that the Milk Control Law upheld in the *Nebbia* case was based upon an emergency and that the constitutionality of the act was sustained upon the basis of the declared existence of such an emergency. Almost every legal innovation has been the product of "emergency"— a condition that deviates from antecedent experience and for which the usual forms of law seem inadequate to serve the public order. Such conditions or emergencies, step by step, gave stimulus to the creations, to the new writs and to the new pleas of the common law during all its vital development. The statutory "emergency" of the last decade in this country has frequently been a legislative fiction, but such fictions to provide treatment for new conditions are in the best tradition of the common law. A declaration of emergency by a legislative body under recent legislative practice is usually a recognition that new conditions require new treatment under regulations that might be and frequently were long continued by successive enactments from time to time. It was inevitable that these new devices of legislative action, having once been accepted as "emergency" legislation and having met the test of experience would in time, and where successful in practice, be accepted as common and legitimate fields of permanent legislation. This statute is an example of that process of evolution.

In dealing, however, with a legislative policy not based upon a declaration of a temporary emergency, and not self-delimited in time of operation, and which lays down a policy which seems to be a permanent part of a substantive law and procedure which will form a basis for the conduct and enterprises of citizens engaged in an important industry, it becomes the judicial function to require that the procedural means adopted to fix the property rights of individuals are in consonance with constitutional guaranties, and particularly with the guaranty of due process of law. Two main problems are thus presented. The first is whether the price-fixing provisions of the statute, and particularly whether the order for the payment of money under its equalization provisions, constitute an invalid delegation of the legislative power of the State vested by the Constitution in the Senate and Assembly. (N. Y. Const.

art. 3, § 1.) The second is whether the means adopted to require equalization payments by these defendants into the common fund established by the Commissioner constitute due process of law as to them. (N. Y. Const. art. 1, § 6.)

The Legislature may provide, under adequate standards fixed by it, for the execution of its legislative policy by administrative agencies, and may confer powers of discretion upon the administrative officer charged with the execution of its policy. It cannot surrender or delegate the legislative power itself. " The Legislature is free to choose among conflicting considerations, and mould the law according to its own will subject only to constitutional restrictions. It cannot delegate the same freedom of choice to an administrative officer. There it must erect guide posts which will enable the officer to carry out the will of the Legislature." (*Matter of Seignious* v. *Rice,* 273 N. Y. 44, 50. See, also, *Stanton* v. *Board of Supervisors,* 191 N. Y. 428, 432; *Darweger* v. *Staats,* 267 id. 290, 305.)

Here the fixing of minimum prices to producers of milk has not expressly been found by the Legislature to be a solution for the evils found to exist within the dairy industry or been expressly incorporated within the declared public policy in relation to those evils. In the absence of such express finding or declaration, the grant of power to the Commissioner to determine that the fixing of prices should be undertaken in the public interest under a declared policy silent in respect of price-fixing, is a naked delegation of legislative power. It is he who makes the determination, essentially legislative in every aspect from which it may be viewed, whether price-fixing is a desirable public policy.

If the statute, read in its entirety, be construed as a determination by the Legislature by implication, that price-fixing for milk is the public policy of the State, the power conferred upon the Commissioner is, nevertheless, an invalid delegation of legislative power, since the standards sought to be established for the exercise of the power admit of arbitrary determinations of legislative policy upon information that the Commissioner has " otherwise " obtained from unfixed and uncertain sources as well as from evidence adduced before him. His determination, under the delegated power conferred, may thus be based wholly upon processes for which there is no standard. (See discussion of legislative standards in *Matter of Elite Dairy Products* v. *Ten Eyck,* 271 N. Y. 488, 494, 495.)

The power to set up and enforce the equalization fund is open to an additional and more serious objection of being a delegation of legislative power without adequate standards, for it is doubtful if the Commissioner is required in any circumstances to grant a

hearing upon this phase of his order. The hearing seems to be provided only upon the question of whether the prices should be fixed and not upon the question whether, if a price-fixing order is made, an equalization plan should also be put in operation. All that seems necessary for the establishment of the equalization plan, under which dealers are compelled to pay their money or the money of their producers, to other dealers and other producers, is the mere arbitrary determination of the Commissioner and the arbitrary assent of the seventy-five per cent of the producers. The power to establish the equalization fund and to compel contributions to it is again a naked delegation of legislative power to the Commissioner and to the assenting percentage of producers who concur with him in the promulgation of the order, without any standard whatever and without express legislative declaration of finding or policy. A delegation of legislative power to a majority of producers constitutes as well an invalid delegation as one to an administrative officer. (*Carter* v. *Carter Coal Co.*, 298 U. S. 238, 311, 312. See, also, discussion in *Highland Farms Dairy* v. *Agnew*, 300 U. S. 608, 614.) A declared legislative policy, a standard for administrative action and a definite finding in the exercise of the authority conferred are each the necessary requisites for vesting of Federal officers with the power to carry out the legislative policies of Congress. (*Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 415.) While the distribution of powers within a State is usually a State question (*Highland Farms Dairy* v. *Agnew*, *supra*), the rule of delegation of powers in New York is substantially similar to the Federal rule.

These considerations likewise apply to the problem of due process. Property may not be taken from one and given to another by the arbitrary fiat of administrative officers or the vote of a majority — even a substantial majority — of the members of an industry. The underlying order fixing minimum prices may itself be based upon facts extrinsic to those developed at the public hearing. Indeed, the order under which enforcement of payments into the equalization fund is sought against these defendants in these actions by the extraordinary and direct coercion of the equitable powers of the court, recites that it was promulgated " upon information otherwise obtained," as well as the testimony at the public hearing. (Exhibit A of the complaints.) And the determination that the equalization fund be established and that defendants contribute money to it is based upon a determination of the Commissioner and the assent of producers for which no hearing was required or is alleged to have been held as to its reasonableness or necessity. A minimum requirement of due process, allowing for variations in method, is always that a procedure be afforded under which he whose property

is to be taken shall be allowed to be heard; that the determination under which he is required to surrender it be reasonable, and that it be free from the opportunity for arbitrary power.

In these respects it would seem to follow that, as to these defendants, the statute must yield to the paramount force of the Constitution.

It is urged that the money these defendants are being required to pay to the equalization fund is the money owed to other persons and that the requirement, accordingly, does not adversely affect the property or rights of these defendants. With respect to the two defendant co-operative corporations, the producers to whom the money is owed have a direct interest in such co-operatives and the defendants themselves have an interest in such moneys closely integrated with the rights of the member-producers. But all of the defendants incur a liability under contract with their producers to pay such money upon demand, and the payment to another under the directions of an invalid statute or in pursuance of a judgment not binding upon such contracting parties would constitute no defense to an action by such producers under their contracts. I conclude, therefore, that all of the defendants have a sufficient interest in the moneys directed to be paid to rely upon the constitutional questions raised in these actions. All of them, surely, are directly affected in their property rights by the enforcement of that part of the order which assesses them for a share of the cost of administering the fund.

Motions for temporary injunction in each case denied.

Complaints in each case dismissed.

Submit orders.