In the Matter of the Application of NEW YORK STATE GUERNSEY BREEDERS CO-OPERATIVE, INC., Petitioner, for an Order under Article 78 of the Civil Practice Act Directed against HOLTON V. NOYES, Commissioner of Agriculture and Markets of the State of New York, Respondent.

BUFFALO MILK PRODUCERS CO-OPERATIVE ASSOCIATION, INC., and HUGH SCOTT, Intervenors, Respondents.

Third Department, July 2, 1940.

*Henry S. Manley*, for the petitioner.

*Milo R. Kniffen, Counsel to Department of Agriculture and Markets of the State of New York [Robert G. Blabey, Assistant Counsel*, of counsel], for the respondent.

*Harry D. Suitor* of counsel, for Hugh Scott, individually and as president of Niagara Frontier Co-operative Milk Producers Bargaining Agency, Inc., and for Buffalo Milk Producers Co-operative Association, Inc., intervenors, respondents.

*Francis L. McElroy*, counsel, for the Metropolitan Co-operative Milk Producers Bargaining Agency, Inc., *amicus curiæ*.

CRAPSER, J. This is a review, under article 78 of the Civil Practice Act, of official Order No. 127 made by respondent under authority given by the Rogers-Allen Law (Laws of 1937, chap. 383, adding to Agriculture and Markets Law, §§ 258-k–258-m, and § 258-n), to regulate and fix prices for milk produced and sold in the Niagara Frontier Milk Marketing Area.

On defendants' oral motion in the Appellate Division on May 13, 1940, in the appeals in *Noyes* v. *Arthur E. Landel*, d/b/a *Williamsville Dairy*, and *Noyes* v. *Sterling Amherst Farms Dairy, Inc.*, with the New York State Guernsey Breeders Co-operative, Inc., as an added defendant in both actions, the appeals in such actions were directed to be perfected at once and argument directed to be heard with that of *New York State Guernsey Breeders Co-operative, Inc.*, v. *Noyes*, a proceeding under article 78 of the Civil Practice Act, which seeks to raise the same issues. (See, also, 259 App. Div. 1108.)

The petitioner is a co-operative association of Guernsey dairy farmers organized under the law of the State of New York and according to the certified statement it had forty-five members in the area subject to the order. The petitioner asserts that there should have been a separate vote on the equalization and that the findings made by the Commissioner were insufficient.

The provisions for equalization for Guernsey milk are not those intended by the statute; moreover, the provisions for classification of Guernsey milk are so unfair as to be unconstitutional.

The order in question is known as order No. 127 and was made by the Commissioner of Agriculture and Markets on September

19, 1938, to become effective October 1, 1938. It was designed to regulate the price to be paid to producers of milk sold in the Niagara Frontier Milk Marketing Area, which comprises the cities of Buffalo, Tonawanda, Lackawanna, Niagara Falls, Lockport and North Tonawanda, and certain contiguous towns in Erie and Niagara counties.

On or about July 25, 1938, a petition for a public hearing on a proposed milk marketing order of the Niagara Frontier Milk Marketing Area was presented to the Commissioner by the Niagara Frontier Co-operative Milk Producers Bargaining Agency, Inc. At the same time and with the petition there was submitted a draft of a proposed order which had been unanimously approved by the bargaining agency's delegates.

The New York State Guernsey Breeders Co-operative, Inc., was a member of the bargaining agency, its delegate was its business manager and assistant treasurer, Mr. B. J. H. Rikert. The New York State Guernsey Breeders Co-operative, Inc., the petitioner herein, through Mr. Rikert, was one of the incorporators of the Niagara Frontier Bargaining Agency and Mr. Rikert's name was the first one subscribed to the certificate of incorporation. The petitioner filed with the bargaining agency a certificate of incorporation, a copy of its by-laws, a copy of the form of contract with its producers and a statement of the number of contracts in force.

The hearing requested by the bargaining agency was held at Buffalo, N. Y., on August 8, 1938. The petitioner herein appeared and was represented by Mr. Rikert who was asked if he desired to object to the order and he replied that he did not. He said, " those of you who have shared in the work of preparing this proposed order and bringing it up to the point of this public hearing know that my Association and I have tried to do our share in that work." He stated that he and his association were " for this order," were not opposed to it, and more than that he said he was not opposed " to any principle involved in it."

The order was submitted to a producer referendum on September 17, 1938, and was duly approved and on September 19, 1938, it was officially announced that an order was made for it to become effective on October 1, 1938.

The petitioner through the defendants Landel and Sterling Amherst Farms Dairy, Inc., to whom it sold milk, moved to dismiss the Commissioner's complaint in suits to restrain the order's violation instituted in the Supreme Court, Albany county, in December, 1938. In January of 1939 the petition in this proceeding was returnable at the Ulster County Special Term. Mr. Justice BERGAN declared sections 258-k and 258-m of the Agriculture and Markets Law unconstitutional and directed the Commissioner to answer the petition in this proceeding. (See 257 App. Div. 877.)

An interlocutory appeal was taken to this court where the question of estoppel which had not been decided by Justice BERGAN was seriously urged. It was urged by the Commissioner that the merits of the proceeding should not be argued in this court until the Court of Appeals had passed upon the constitutionality of the Rogers-Allen Law in the four cases wherein the Commissioner's complaints had been dismissed. In May, 1939, this court, without passing upon the estoppel, affirmed the order below directing the Commissioner to answer but held that it was improper to discuss the case on the merits until the Court of Appeals had answered the question of the constitutionality of the statute. (257 App. Div. 877.)

In July, 1939, the Court of Appeals unanimously reversed the Special Term in the four injunction suits (*Noyes* v. *Erie & Wyoming Farmers Co-op. Corp.*, 170 Misc. 42; 281 N. Y. 187). The Court of Appeals said: "'The guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained.'" (Citing *Nebbia* v. *New York*, 291 U. S. 502, 525.)

Neither the act nor the order promulgating it is arbitrary, capricious or unreasonable under the facts set up in the complaints.

The petitioner herein then moved before Mr. Justice BERGAN to be joined as a party defendant in the *Landel* and *Sterling* cases. This request was granted over the objections of the Commissioner.

The Rogers-Allen Law (Laws of 1937, chap. 383) is a price-fixing statute, it fixed minimum prices to producers only, and no resale or consumer prices are fixed, it is co-operative. It authorized the creation of producers' bargaining agencies, of distributors' bargaining agencies. Having organized for bargaining purposes, these groups, subject to the approval of the Commissioner, may agree among themselves upon a marketing contract. Failing to agree, the producers' agency may apply to the Commissioner to call a public hearing upon a proposed order to fix and determine for the marketing area minimum prices to be paid producers. (Agriculture and Markets Law, § 258-m.) This may be done by a producers' bargaining agency representing at least thirty-five per cent of the producers of milk in the production area. The petitioner herein conceded that more than thirty-five per cent of the producers in the production area were represented by the bargaining agency. The statutory procedure contemplates public hearings, approval of a proposed order and promulgation by the Commissioner.

The plan of fixing a price to the producers only is founded upon a legislative declaration of policy as set forth in section 258-k of the Agriculture and Markets Law.

The notice of the hearing recites that " a Producers' Bargaining Agency representing at least thirty-five per centum of the producers supplying milk to the Niagara Frontier Milk Marketing Area " submitted a petition to the Commissioner alleging " the existence of conditions so affecting the orderly marketing of milk " that the public interest requires the regulation of prices to be paid producers. The time and place are set forth. The purpose is described to be the receiving of " factual evidence " as to whether the conditions alleged really exist. The announcement is made that the evidence will determine whether provisions should be incorporated in the order for (a) classification of milk, (b) minimum prices, (c) reports of dealers, (d) payments to producers through the use of a market-wide equalization pool, and (e) deductions for administration. Finally, the notice recites that copies of the proposed order as submitted could be inspected at or procured from the Commissioner's Albany office.

The hearing was held and testimony was taken under oath. All who wished had a reasonable opportunity to appear and express their views in regard to the proposed order. The petitioner stated through Mr. Rikert that they were in favor of this order. As the result of the public hearing and relying upon the testimony, statements and declarations there given, the Commissioner called a referendum on the question of the adoption of the milk marketing order thus petitioned for and thus considered and a referendum was held in due course on the 15th of September, 1938, and after the referendum the Commissioner found from the votes cast that more than seventy-five per cent of the producers of the area desired the order then advertised and voted for and now known and promulgated as No. 127. He found that the public interest as declared by the Legislature by section 258-k of the Agriculture and Markets Law required the regulation of milk prices in the Niagara Frontier Area and on September nineteenth he officially directed that Order No. 127, so voted, to become effective on and after twelve-one A. M. Eastern Standard time, on October 1, 1938.

Many more than a majority of those subject to the order fully complied with it. The petitioner was one of the few exceptions although it publicly stated that it was " for this order."

The order provides that all milk received from producers shall be classified, the classification is based upon utilization, being four in number, and minimum prices are established for each class. It provides for the filing of verified monthly reports of prescribed information. It explains the computation of the net pool obligation of the marketer and the uniform price. It authorizes differentials for butter fat, for direct delivery of milk by the farmer to

the city dealer's plant. It directs the manner of making payments to producers. It creates an equalization fund and authorizes the appointment of a fiscal agent and provides for payments by marketers into the fund. For the purpose of administering the order it provided that each marketer should deduct from the price paid to the producer an amount to be fixed by the Commissioner but in no event to exceed two cents per hundred weight.

The Commissioner by virtue of his official position was empowered by the Agriculture and Markets Law to enforce the order. He may, from time to time, upon petition and public hearing amend it.

The determination by Mr. Justice BERGAN in the Erie and Wyoming group of cases rendered inoperative official Order No. 127. (170 Misc. 42.) The Legislature then passed the Nunan-Allen Bill (Laws of 1939, chap. 760) which became operative on June 7, 1939. The Nunan-Allen Law authorized the Commissioner to repromulgate official Order No. 127. In compliance with the legislative permission the Commissioner on June 28, 1939, repromulgated official Order No. 127, the effective date of which was July 1, 1939. On July 11, 1939, the Court of Appeals held the Rogers-Allen Law constitutional. (281 N. Y. 187.)

This petitioner asserts a grievance because a separate vote on the order of equalization provisions was not taken. Section 258-m of the Agriculture and Markets Law does not require a separate vote on equalization. It provides that the Commissioner must find that seventy-five per cent of the producers affected must approve equalization. It does not matter in what subdivision of the section equalization is first mentioned.

The act was passed for the purpose of enabling all producers within a certain designated area to receive the same base price for their milk and equalization naturally has to be a part of the price-fixing arrangement in order to give every producer the same base price. There is nothing mysterious or unusual about equalization. Dealers pay a different price for milk that they use in different classes. If the value of the milk purchased by the dealer to be used in such classes as he may use it exceeds the amount computed as due the producer the dealer pays the difference into the fund. If the value of his milk is less than the amount due to the producers he receives from the fund a sum for payment to the producers. There are certain differentials which are well understood, when direct delivery differentials are allowed dealers are permitted to deduct the amount from their own pool obligation and to pay it to the producers. The direct delivery differential is borne by the whole market and it is justified by the reason of the fact of the service for which it is given. The butter fat differential com-

pensates the producer for milk having a rich butter fat content. There are deductions for expenses and reserves set aside for market services and other contingencies.

The Commissioner did not depend upon the examinations at the hearing, which was well advertised and where the whole matter was discussed and where the petitioner's officer stated that he was fully in favor of the order but only after the referendum did he make his findings.

It was necessary for the Commissioner only to determine the necessity for the order. The petitioner and the other members of the bargaining agency had set forth their approval in their petition to him. The evidence given in the hearing added further weight for the necessity for it and all he had to do was to determine that there was a necessity for such an order and this he did in the proper way.

Equalization was provided for in the order. The Commissioner has found:

" 3. That upon the basis of a referendum conducted by me, Official Order No. 127 regulating the handling of milk produced in the production area for the said Niagara Frontier Milk Marketing Area is favored by more than seventy-five per centum of the producers of milk produced in such production area."

The finding is proper in all particulars and was based upon sufficient evidence, information and knowledge. (*Matter of Elite Dairy Products* v. *Ten Eyck*, 271 N. Y. 488.)

Section 1296 of the Civil Practice Act provides:

" Where the determination under review was made as the result of a hearing held, and at which evidence was taken, pursuant to statutory direction, the following questions shall also be determined * * *.

" 6. Whether there was any competent proof of all the facts necessary to be proved in order to authorize the making of the determination.

" 7. If there was such proof, whether, upon all the evidence, there was such a preponderance of proof against the existence of any of those facts that the verdict of a jury, affirming the existence thereof, rendered in an action in the supreme court triable by a jury, would be set aside by the court as against the weight of evidence."

Equalization as a means of price fixing has been held constitutional in both State and Federal courts. (*Noyes* v. *Erie & Wyoming Farmers Co-op. Corp.*, 281 N. Y. 187; *United States* v. *Rock Royal Co-op.*, 307 U. S. 533; *Hood & Sons* v. *United States*, Id. 588.)

The evidence in the record shows that the petitioner received benefits from the order, that the adoption of the order strengthened the Buffalo milk price structure and that members of the petitioner benefited by the order's increased returns.

The order provides for a differential for butterfat over 3.5 and upon the uncontradicted evidence the petitioner's members received by reason of the test of their milk a higher price than lower testing breeds.

There is nothing in the order that prohibits the dealers from charging any price they desire for milk. The dealers handling Guernsey milk under this order are not prohibited from charging more for it and it is to be presumed that an article will bring what it is worth. The evidence fails to show that the provisions for equalization for Guernsey milk under this order are unfair or unreasonable or arbritary or capricious. They were contained in the order when it was up for the hearing and the petitioner's managing officer said that they were entirely in favor of it. It was no new or untried experiment. The petitioner by this proceeding is simply trying to gain an advantage for its members which is not justified and if permitted will probably destroy all milk orders and return the milk situation into the chaos that it was before the promulgation of any orders either Federal or State.

The Agriculture and Markets Law provides the method for amending or revoking this order and the petitioner did not avail itself of the methods provided for its amendment or repeal but accepted without comment the benefits of butter fat differentials and other differentials provided by the order and of the increased price paid by reason of the order and then by this proceeding seeks to get its members a little more and obtain further advantage by reason of the color of their milk.

The law defines what milk is and there is no proof in this record that that is not what Guernsey cows produce. There is plenty of debate in periodicals and among medical men as to whether milk from a particular breed of cows is better for babies and young children than others and it would be fully as reasonable for the owners of Holstein cows to ask for a special treatment under this order for their milk because the Holstein cow produces a greater amount of Vitamin A activity from carotin than does the Guernsey cow. The reason that the milk from the Guernsey cows is more yellow is because the Guernsey cow does not function and is insufficient in the carotin activity in Vitamin A.

Mr. Justice CARDOZO, when in 1934 the United States Supreme Court heard a similar complaint regarding price orders of the former Milk Control Board, said that the Constitution does not protect a

business from the hazards of competition and, said he, particularly where it is from the hazards of the order, and not from restraints of law capriciously imposed, that appellant seeks relief. (*Hegeman Farms Corp.* v. *Baldwin*, 293 U. S. 163, at pp. 170, 171.)

The New York State Guernsey Breeders Co-Operative, Inc., was and is a member of the bargaining agency which petitioned and sponsored the order in question. The draft submitted to the Commissioner was unanimously approved by the agency's delegates, at that time the petitioner's delegate was Mr. B. J. H. Rikert who appeared at the hearing and approved the order.

The respondent alleges that the petitioner is estopped to question the validity of Order No. 127 or its application to the New York State Guernsey Breeders Co-Operative, Inc.

" The essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially." (19 Am. Jur., Estoppel, § 42, 642; *Crary* v. *Dye*, 208 U. S. 515.)

Equitable estoppel forecloses one from denying his own expressed or implied admission which has in good faith and in pursuance of its purpose been accepted and acted upon by another. (*State ex rel. Shartel* v. *Missouri Utilities Co.*, 331 Mo. 337; 53 S. W. [2d] 394; 89 A. L. R. 607; *State ex rel. McKittrick* v. *Missouri Utilities Co.*, 339 Mo. 385; 96 S. W. [2d] 607; 106 A. L. R. 1169; *City of Glendale* v. *Coquat*, 46 Ariz. 478; 52 P. [2d] 1178; 102 A. L. R. 837.)

No constitutional question is involved here which has not already been resolved in the Commissioner's favor. The reasonableness and fairness of the order are shown by the way in which it has worked and by the benefits which the petitioner has received under it. The attitude taken by the petitioner upon the hearing and the signing of the petitioner in promulgating the order had some influence upon the Commissioner's mind in adopting the order and the petitioner is equitably estopped from questioning the order at this time. (*Matter of N. Y. State Guernsey Breeders Co-op., Inc.*, v. *Noyes*, 257 App. Div. 877; *Matter of N. Y. S. Guernsey Breeders' Co-op.* v. *Noyes*, 260 id. 139.)

The petition should be dismissed and the order confirmed, with costs.

Bliss and Foster, JJ., concur; Hill, P. J., and Heffernan, J., dissent; Hill, P. J., in an opinion in which Heffernan, J., concurs.

Hill, P. J. (dissenting). This is a review, under article 78 of the Civil Practice Act, of official Order No. 127 made by respondent under authority given by the Rogers-Allen Law (Laws of 1937, chap. 383) to regulate and fix prices for milk produced and sold in the Niagara Frontier Marketing Area. The petitioner is a co-operative association of Guernsey dairy farmers, organized under the laws of the State. Some of its members are affected by the order. While the petitioner asserts irregularities in the adoption and promulgation of the order, the primary objection is that by failing to establish " reasonable differentials for quality " it is confiscatory of the property of the members of the petitioner corporation, as " Golden Guernsey " milk which they produce is of greater value than other pooled milk, and entitled to a favorable differential under the pooling plan, and that Order No. 127 places it on a parity with milk of less market value.

The order was made by respondent as Commissioner of Agriculture and Markets on September 19, 1938, to become effective October first. It was designed to regulate the price of milk produced and sold in the Niagara Frontier Marketing Area, which comprises the cities of Buffalo, Tonawanda, Lackawanna, Niagara Falls, Lockport and North Tonawanda, and certain contiguous towns in Erie and Niagara counties. It establishes an equalization fund to be paid to and disbursed by a fiscal agent. Marketers of milk within the area who received a greater amount of money than would be produced by the uniform prices fixed by the Commissioner are required to pay the surplus to the fiscal agent, who makes payments therefrom to those who receive less than the fixed amount, to equalize the disparity. Many and varied are the details of the plan. Only essentials will be discussed.

The milk is divided into four classes according to its expected use. The milk of each producer is divided among the classes in the same proportion which the amount he delivers bears to the entire milk sold by the marketer. The Commissioner fixes a minimum which the marketer must pay for each class, and which is used to determine whether a marketer is to contribute to or receive from the fund. Class I is milk which leaves the plant where it is received from the producer as " whole milk, chocolate milk or any whole milk drink, and all other milk for which classification is not established in some other class." The minimum price fixed for this class varies from $2.35 to $2.85 a hundred, dependent upon the period of the year and whether the milk was a direct delivery by the producer to the utilizing plant. No

data is given as to the means by which these prices are fixed. Class II-a milk is that which the marketer sells in the form of sweet or sour fluid cream. Its price varies according to a schedule and table set out at length in the order. It is dependent upon the season of the year and the butter price range reported by the United States Department of Agriculture " for 92-score butter at wholesale in the New York market." To illustrate, from March first through July, if butter sells between 30 cents and 34.9 cents per pound, the price of the milk is $1.85 per hundred. Class II-c is used in the manufacture of ice cream " and milk used for all other purposes, except as described in Classes I, II-a and IV-a." The price thereof is fixed as " not less than $.15 more than the price determined for Class IV-a milk." Class IV-a milk is made into butter. The price is fixed according to the following formula: " From the average of the highest price reported daily during such month by the United States Department of Agriculture for 92-score butter wholesale in the New York market deduct 4¢, add 20% and multiply by 3.5." Applying this formula to butter at 30 cents a pound, the price of the milk is $1.092 per hundred.

These prices are for milk containing 3.5 per cent butter fat. All milk, Golden Guernsey, Holstein and that produced by any other breed, is on a parity except for the butter fat content. For Classes I, II-a and II-c, the price is reduced four cents a hundred for each one-tenth of one per cent which a producer's milk falls below the standard, and increased a like amount for being above. The differential as to Class IV-a is arrived at by dividing the price per hundred fixed by the butter quotation formula by 3.5. Applying this to butter at thirty cents a pound for March through July, the increment or diminution is .0312 for each one-tenth of one per cent. Co-operative associations like the Dairymen's League are allowed a differential or cooperative service payment of five cents per hundred on all milk they handle, plus eighteen or twenty cents per hundred weight and transportation charges upon certain milk which they give extra handling. New producers are penalized for the first month by having all their milk placed in Class IV-a. The milk of a producer who is also a marketer is not classified, and no report thereon is made to the fiscal officer. Two cents for each hundred of pooled milk is required to be paid to the respondent to defray the cost of administering the order. It is to be deposited with a trust company, is subject to withdrawal at respondent's direction, and is not deemed to be State money. No provision for paying out any surplus which might be built up is made, except that when the Commissioner terminates the order, he is required to

" dispose in an equitable manner of all funds received pursuant to the provisions of this order, together with claims for any funds which are unpaid and owing at the time of such termination or suspension."

There is more demand for Guernsey as whole or fluid milk than for that produced from other breeds because of its yellow color and higher content of butter fat. (This would not be true as to milk from Jersey cows, but the amount of that in the pool is negligible or non-existent.) Petitioner established that in a given month nearly eighty-five per cent of the Guernsey milk supplied in Buffalo was sold as whole milk at the Class I price; just over fourteen per cent as fluid cream, the second highest priced class, and less than one per cent used for butter. The report of the Commissioner shows that for a given month just over sixty-four per cent of the pooled milk was sold as Class I, seventeen per cent as cream, seven per cent as ice cream, and twelve per cent used for butter. As the prices for the respective classes vary from $2.85 down to $1.02, the added value of milk which the public desire to use on the table is obvious. This preference of the public for Guernsey milk makes it more valuable than other milk, and a favorable differential was proposed to, but rejected by, the Commissioner. In another case (*Matter of Begent* v. *Noyes*, 260 App. Div. 231) the respondent required that a dealer in Ithaca should receive one cent a quart more for Guernsey milk than for that produced by other breeds. The petitioner has expended $300,000 during the past years in acquainting the public with the merits of Guernsey milk. It costs more to produce Guernsey milk than Holstein milk. The latter breed will produce considerably more milk per cow of an equal butter fat content, than the former, but it lacks other food elements and the attractive color which makes Guernsey milk more salable.

The butter fat differential does not compensate petitioner. Whenever the selling price of milk is above $1.40 per hundred, the amount allowed therefor is more than 4¢ for each one-tenth of one per cent up to the standard of 3.5 (40¢ for each 1% of fat 3.5). With 3.5 butter fat milk selling at $2.80 per hundred, which is slightly less than was received for whole milk sold in the Frontier area as reported by the Commissioner, 80¢ is paid for each one per cent (3.5 × 80). 3.5% butter fat is the average content of milk generally; the average for Guernsey milk is at least 4.5%. Thus, for the first 3.5%, 80¢ is paid for each one per cent, while only 40¢ is paid for the top and desirable one per cent. For table use, the public is willing to pay more for rich yellow milk (Guernsey) than for rich white or blue white milk (Holstein). It is no answer

to say that the latter has all the nutritive value of the former. Diamonds and coal are each composed of carbon. The public will pay more per pound for the former.

Petitioner may not sell its milk to the public without respondent's permit and license. (Agriculture and Markets Law, § 254.) Order No. 127 controls and restricts the selling of petitioner's milk. Unless a producer is able to sell all his milk at prices in excess of the Class I price as fixed by the Commissioner, the amount at which it sells above the uniform price fixed goes into the equalization fund which is paid to producers who receive less than the uniform price fixed by the Commissioner. (Order 127, art. 6.) The order contains no provision under which petitioner may be compensated for the excess market value of its product, or whereunder it may have returned the money expended to produce Guernsey milk, which, unquestionably, is greater than the cost of producing Holstein milk.

This order and the statute under which it is made by the Commissioner have been the subject of litigation. (*Noyes* v. *Erie & Wyoming Farmers Co-op. Corp.*, 281 N. Y. 187.) The Albany Special Term dismissed the complaint of this respondent in actions brought to enforce the order. This was reversed by the Court of Appeals. Implicit in that decision was a determination that the statute and the order were constitutional and that proper steps had been taken to establish and promulgate the order. The issue was not presented to the Court of Appeals and by appropriate language in the opinion it left open for decision all questions as to the rights of individuals under the Fifth and Fourteenth Amendments to the Federal Constitution when an individual or group should make it appear that " the order or regulation issued thereunder would cause him injury " (p. 195). Whether the enforcement of the order is discriminatory " would necessarily depend upon the facts and circumstances in each particular case at bar after the issues were duly presented and the facts then at issue developed " (p. 195). The court stated that further consideration of the constitutionality of the act could be had whenever a litigant should show by proper pleading " that he comes within the scope of the act and that special features thereof or of the order or regulation issued thereunder would cause him injury " (p. 195). A majority of the present Supreme Court of the United States has recognized and announced that there may be an " exaggerated equalization of wealth and opportunity." (*United States* v. *Rock Royal Co-op.*, 307 U. S. 572.) The requirement that petitioner shall sell its product, costing more to produce and for which there is a greater market value, at the same price of an article costing less to produce and for which

the market price is lower is " exaggerated equalization," and confiscatory, and violates its constitutional rights.

The order should be annulled in so far as it denies petitioner's right to a favorable differential in the pooling plan, and the matter should be remitted to the Commissioner for such proceedings as he deems proper to ascertain the amount of and the manner in which the differential shall be effected.

HEFFERNAN, J., concurs.

Order confirmed and petition dismissed.