QUEENSBORO FARM PRODUCTS, INC., Claimant, *v.* THE STATE OF NEW YORK, Defendant.

(Claim No. 25529.)

Court of Claims, December 21, 1940.

*Goldenthal Brothers* [*Jacob J. Schwartzwald* and *Nathan A. Goldenthal* of counsel], for the claimant.

*John J. Bennett, Jr., Attorney-General* [*Jacob S. Honigsbaum, Assistant Attorney-General*, of counsel], for the State of New York

RYAN, J.   By proposal, dated December 10, 1937, and acceptance, claimant contracted with the State of New York to deliver daily between January 1, 1938, and December 31, 1938, 3,280 quarts of Grade B pasteurized milk to the Creedmoor State Hospital at Queens Village at the price of $.0644 per quart.   Claimant fulfilled and the State paid at the stipulated rate.

The contract, however, contained the following provision:

" Proposal and Price:

" All bids are to be submitted on the forms furnished and net price per quart F. O. B. point of destination shall be the basis of award.

" In the event that a price order, pursuant to the provision of Article 21, as amended by Chapter 383 of the Laws of 1937 of the Agriculture and Markets' Law, is made effective by the Commissioner of Agriculture and Markets in the market where this milk is to be delivered, the Division of Standards and Purchase may in its discretion permit an adjustment of the price paid for milk delivered in accordance with such contract, so that such price will not be out of proportion to the terms of the official price regulations."

The constitutionality of chapter 383 of the Laws of 1937 has been tested and upheld.   (*Noyes* v. *Erie & Wyoming Farmers Co-op. Corp.*, 281 N. Y. 187, revg. 170 Misc. 42.)   Pursuant to the provisions of this act, the State's Commissioner of Agriculture and Markets and the United States Department of Agriculture by the Agricultural Adjustment Administration set up a market administrator for the New York Metropolitan milk marketing area to regulate the price of milk paid by handlers of milk to the producers of milk.   On August 5, 1938, the A. A. A. issued official order No. 27 and on August 25, 1938, the State Commissioner of Agriculture and Markets issued official order No. 126 which were designed to regulate the handling of milk to be sold in the Metropolitan area.   These orders fixed the price of Class I milk, 3.5 per cent butter fat content, the kind of milk claimant had contracted to furnish to the State.   The price was $2.45 per hundredweight and

in addition there was ordered a fixed administration charge of two cents per hundredweight, bringing the full established price to $2.47 per hundredweight. This price was in effect from September 1, 1938, to December 31, 1938, or during the last four months of the life of claimant's contract. During this period of time claimant delivered 400,160 quarts of milk.

The promulgation of the marketing orders by the Federal and State agencies increased the price which the claimant had to pay producers for the 400,160 quarts of milk it furnished the State over the prices which it had been paying for milk prior to September 1, 1938. Thereupon the claimant called upon the State Division of Standards and Purchase for an adjustment in the price of the milk it was delivering to the Creedmoor State Hospital and invoked that provision of the contract hereinabove quoted. Negotiations for a price adjustment were carried on by personal interview and by correspondence between the claimant's officers and the State's representatives over a period from September 13, 1938, to May 17, 1939, when the Superintendent of the Division of Standards and Purchase rejected claimant's demand for increased compensation.

Thereafter and on June 30, 1939, claimant filed its notice of intention to file a claim against the State with the clerk of the Court of Claims and served a copy on the Attorney-General. Its claim was filed September 14, 1939. Claimant asserts that it paid $2.47 per hundredweight as against an estimated cost to it of $1.70 or a difference of $0.77 per hundredweight. This figure converted to a price per quart, on the basis that forty quarts of milk equals eighty-five per cent of a hundredweight, gives the rate of $.01636 per quart and for 400,160 quarts amounts to $6,546.61, for which sum, with interest, claimant herein demands recovery.

The Attorney-General opposes an award, *first*, upon jurisdictional grounds and, *second*, upon the merits. As to jurisdiction, the Attorney-General says in the first place that the claimant has mistaken its remedy and that it should have proceeded in the Supreme Court under article 78 of the Civil Practice Act. This article was added by chapter 526 of the Laws of 1937 in effect September 1, 1937, and is entitled " Proceeding Against a Body or Officer," and the first section thereof, section 1283, abolishes the classifications of writs and orders of certiorari to review, mandamus and prohibition and provides that the relief theretofore obtained by such writs or orders shall thereafter be obtained as provided in this article. We are of the opinion that this article has no application to claimant's situation. Without going into a dis-

cussion of the practice under article 78 and of the rights of petitioner and respondent in a proceeding taken pursuant to its provisions, we refer merely to the language of sections 1284, 1285 and 1296 as indicating the reasons for our opinion that this article is inapplicable.

The act of the Superintendent of the Division of Standards and Purchase in rejecting claimant's demand for increased compensation under the contract provision is not in the same category of official action as that of the Commissioner of Agriculture and Markets in promulgating the milk marketing order No. 126 under chapter 383 of the Laws of 1937. The latter action could have been reviewed, upon the petition of proper parties in interest, under the provisions of article 78 of the Civil Practice Act which was invoked to review similar milk marketing orders promulgated for other areas. (See *Matter of New York State Guernsey Breeders Co-op., Inc.*, v. *Noyes*, 260 App. Div. 240; modified in part and as modified affirmed, 284 N. Y. 197. See, also, *Matter of New York State Guernsey Breeders' Co-op., Inc.*, v. *Noyes*, 260 App. Div. 139.) Anyway claimant did not attempt to avail itself of the provisions of article 78 and the limitation imposed by section 1286 has expired.

We pass to the second jurisdictional objection raised by the defense. It is that, acceding to claimant's contention that this action is upon a contract, it is out of court for the months of September, October and November, 1938, because the items of damages demanded for those months accrued more than six months prior to June 30, 1939, the date on which the claim was filed, as provided in subdivision 4 of section 15 of the Court of Claims Act (now § 10, subd. 4).

We cannot agree with the Attorney-General's contention. If claimant has a cause of action on contract, it did not accrue until the rejection of claimant's demand by the Superintendent of the Division of Standards and Purchase. That was on May 17, 1939. See section 12 of the Court of Claims Act, as it read prior to the amendment in effect July 1, 1939, which included this sentence: " But the court has no jurisdiction of a claim submitted by law to any other tribunal or officer for audit or determination except where the claim is founded upon express contract and such claim, or some part thereof, has been rejected by such tribunal or officer." (See, also, *Edlus Constr. Corp.* v. *State*, 277 N. Y. 635.)

Having reached the conclusion that this claim was properly filed and that this court has jurisdiction to hear and determine it, we proceed to examine the nature of claimant's complaint and the evidence offered to support it and to defeat it and to reach a determination on the merits.

Emergency milk control was initiated by the Legislature with chapter 158 of the Laws of 1933 for the experimental period ending March 31, 1934. It was continued by yearly enactments and expired April 1, 1937. Thereafter a new declaration of policy was adopted by the Legislature with the enactment of chapter 383 of the Laws of 1937, in effect May 19, 1937, the statute which is the underlying basis of this litigation. (See § 258-k.) Producers bargaining agencies and distributors' bargaining agencies were recognized and authorized. (§ 258-l.)

Under State milk control there developed the classified price plan, that is, the fixing of different price values for Class I, or fluid milk, and for the various other classes defined and used for manufactured milk products, butter, cheese, evaporated milk, ice cream, etc. Milk was purchased and paid for according to the use to which it was to be put. Out of the classified price plan came the blended price which represented the average of all established classified prices. In the words of the claimant's vice-president, a blended price is defined as follows: " A blended price is a price paid to producers based upon a pool average weighted by the volume of milk disposed of, according to different types of utilization. One type of utilization is fluid use. The other types fall into manufactured uses. A different value is placed upon the milk according to its use if we are paying for this milk according to a classification plan. The blend is the weighted average of each of these classes, the amount of milk at each value all added up and averaged out to strike a blend or average price for all the milk bought from producers."

With the expiration of State milk control on April 1, 1937, only the larger milk distributors, whose operations encompassed both the selling of fluid milk in the city of New York and the manufacture of milk products, continued to operate on the classified price plan Smaller companies, engaged only in the selling of fluid milk in the city of New York, began to revert to the flat price basis. A flat price is a price paid to the producer for all the milk sold by him regardless of use. The distributor who paid the flat price would take of all the production.

One of the largest dealers in the Metropolitan area is the Sheffield Farms Company. This company, between the tenth and fifteenth of each month, published the blended price which it had paid to producers during the previous month. Within a day or two thereafter the other dealers would announce their prices. Flat prices tended to correspond to the blended prices. Claimant's vice-president testified that he considered the blended prices as part of general experience. Without government regulation claim-

ant paid " a flat price which was very close to or equal to Sheffield's blended price."

In 1937 there was organized the New York Metropolitan Milk Distributors Bargaining Agency which, with the authorization of the statute (§ 258-l), negotiated terms of sale with producers which included both classified buying and flat price buying. This claimant was a member of this bargaining agency in the months of August through December, 1937, but not thereafter until some time after September 1, 1938. The Sheffield Farms Company, however, was a member of the said bargaining agency throughout January to August, 1938. During this period Sheffield operated on the classified alternative in the terms of sale.

In the month of December, 1937, the price negotiated by the bargaining agency on the classified price plan was $2.63 per hundredweight for milk for fluid distribution. The alternative was to take the entire output of country plants at the flat price of $2.48 per hundredweight. Claimant took this alternative.

Deliveries under claimant's contract with the State began January 1, 1938. Claimant had then ceased to be a member of the bargaining agency. The agency negotiated for its members a Class I price of $2.20 per hundredweight, which was in effect from January 16, 1938, to March 27, 1938, and a Class I price of $2 per hundredweight from that date to the end of August. During that period of time the blended prices announced by Sheffield were as follows: January, $2.13; February, $1.96; March, $1.77; April, $1.525; May, $1.40; June, $1.38; July, $1.405, and August, $1.43, or an average of $1.62 ½ per hundredweight for the period.

As we have stated hereinabove, claimant asks to be paid the difference between the government fixed price of $2.47 and an estimated average cost to it of $1.70, or 77 cents per hundredweight.* The record does not disclose what claimant actually paid for the milk it has bought to fulfill the requirements of the State's contract for the first eight months. The claimant's vice-president testified that he had the figures that his company paid at one plant and that he thought they would show an average of $1.58 or $1.59, as compared to the $1.62½ paid by Sheffield. Upon further examination, however, it appeared that at this one plant claimant paid in April $1.45125 as compared with Sheffield's $1.525; in May $1.28625 as compared with $1.40; in June $1.28625 as compared with $1.38; in July $1.35625 as compared with $1.405

---

* Claimant's first letter demanded this figure. The testimony gave $1.65 as the estimated average cost of the milk. The claim follows the figure given in the letter The figure of $1.70 apparently includes an allowance for creamery, handling, freight, pasteurizing, delivery, overhead, etc., estimated to be $1 to $1.20 per forty-quart can.

and in August $1.35625 as compared with $1.43. The claimant's vice-president further testified that the figures given for the one plant were a general indication of about what the claimant paid. He said: " This is a price. We did not give any explanation whether it was classified, blend, or not." But he had previously testified that Queensboro paid only a flat price and, therefore, we understand the figures given for this one plant for April to August to be a flat price.

One more recital of prices. After September 1, 1938, following the application of classifications by government order, the blended price was as follows: September, $1.87; October, $1.91; November, $2.10, and December, $2.02.

We have reviewed in some detail the testimony as to milk prices because the defense argues that claimant has not used the " same common denominator " in comparing prices to arrive at the amount of its damages; that claimant has compared the Class I price after September 1, 1938, with the blended price prior to that date to arrive at the claimed difference of 77 cents. Claimant has not done exactly this. Rather, it has taken an estimated flat price, which it says would closely follow the blended price, to arrive at its differential. Thus while it appears, as the defense argues, that the price of Class I fluid milk was always the top price and always higher than the blended price, nevertheless when there was no regulation, no enforced classification, claimant and other independent dealers were able to buy at flat prices, taking all the milk regardless of its utilization whether distributed for consumption as fluid milk or in manufactured form.

What these flat prices might have been in September to December, 1938, without governmental regulation, seems to us entirely speculative. The price of milk is always higher in the fall and winter months when production falls off. Claimant contemplated this factor in making up its bid, but asks this court to find, in effect, that the flat price it would have had to pay would not have exceeded $1.70. Yet in January, 1938, a winter month, the Sheffield blended price, which the flat price closely followed, was $2.13 without regulation, while in December, 1938, a winter month, the blended price was $2.02 with regulation.

But whether claimant's alleged damages are based on a double standard of comparison or are speculative is not the chief difficulty. Is claimant entitled to any damages at all? What was the nature of the promise which claimant seeks to enforce? To repeat, the stipulation was that, in the event a price order was made effective, the " Division of Standards and Purchase *may in its discretion permit an adjustment* of the price paid for milk delivered

in accordance with such contract, so that such price will not be out of proportion to the terms of the official price regulations."

Was this promise enforcible? Was it more than a promise to negotiate? Clearly, after September first claimant was losing money on the milk it was delivering to the State.* But suppose the contract had been awarded at a price per quart equivalent to $2.47 per hundredweight and the Commissioner's order had fixed the price at $1.70. In that event would the State be legally entitled to a credit? We think not. And yet was not the clause inserted in the contract for the benefit of both parties?

It was unfortunate that the claimant lost money on the milk delivered in the last four months of 1938 but there is no legal obligation of contract so long as any essential element is open to negotiation. (*Petze* v *Morse Dry Dock & Repair Co.*, 125 App. Div. 267, 270; affd., 195 N. Y. 584.)

" It is elementary in the law that, for the validity of a contract, the promise, or the agreement, of the parties to it must be certain and explicit and that their full intention may be ascertained to a reasonable degree of certainty. Their agreement must be neither vague nor indefinite." (*Varney* v. *Ditmars*, 217 N. Y. 223, 228, citing *United Press* v. *New York Press Co.*, 164 id. 406.)

In the latter case the court held that what the parties intended was to reserve the price for adjustment. Here, the price was agreed upon and that agreed price has been paid But, so far as any additional price was contemplated, it was left open to adjustment and that adjustment to be in the discretion of the State's agent. The document was entirely silent as to what the adjustment would be. It did not say that the State would pay the difference between what it was paying the claimant and the price fixed by the Commissioner of Agriculture and Markets no, that the State would pay the difference between what the milk would have cost the claimant without the Commissioner's order and the price he fixed. There is completely lacking in the contract any basis for establishing a measure of damages

Moreover, in the absence of misrepresentation or deception, there is no moral obligation to recompense claimant. (*Weston* v. *State*, 262 N. Y. 46, 51.) The State did not misrepresent or deceive the claimant. The agreement was that the State's agency " may in its discretion permit an adjustment of the price " Claimant and its officers were familiar with existing conditions in the milk market and were qualified to anticipate what might happen. Even where the increased cost of labor and materials was due to the

---

* Claimant paid $2.099 for a forty-quart can the handling of which cost from $1 to $1.20. The State paid claimant $2.576 for forty quarts.

unexpected event of the first World war a contractor could not be discharged from the obligation of his contract however onerous the burden. (*Gordon* v. *State*, 233 N. Y. 1, 7.)

Complaint is made that the action of the Division of Standards and Purchase was capricious and arbitrary because in his letter of rejection dated May 17, 1939, the superintendent of that division wrote as follows: " We regret to advise that we are unable to extend favorable consideration to your request for the reason that at the time the contract was awarded, the prevailing Class I price was higher than .the price established under the State and Federal orders effective September 1, 1938."

As we have already noted, in December, 1937, the Class I price was $2.63 and the claimant was buying milk at a flat price of $2.48. But the decision of the Division of Standards and Purchase must be judged not alone on the above-quoted and final letter but upon all the correspondence which passed between the claimant and that department and besides upon all the information available as to market conditions and prices in 1938.

Claimant says that the December, 1937, price was high because 1937 was a drought year and that because of over production in 1938, prices went down. It must be presumed that the Superintendent of the Division of Standards and Purchase in discharging his duty as a public officer considered all of these factors unless the contrary is shown.

We find insufficient evidence on which to make a finding that the action of the Division of Standards and Purchase was arbitrary and capricious. But if such a finding were justified by the evidence before us it could give no binding force to a clause which is unenforcible nor create for the parties a contract where none existed.

The claim must be dismissed upon the merits. Enter decision accordingly.